```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF GEORGIA
 2                         AUGUSTA DIVISION

 3

 4   UNITED STATES OF AMERICA     :
                                  :   Criminal Action No.
 5   vs.                          :   108-CR-099
                                  :
 6                                :
     DANIEL WEBSTER CASON,        :   Augusta, Georgia
 7                                :   December 1, 2009
                  Defendant.      :   9:03 a.m.
 8   _____:

 9

10                            SENTENCE
                  BEFORE THE HONORABLE J. RANDAL HALL
11                    United States District Judge

12

13                     A-P-P-E-A-R-A-N-C-E-S

14
     For the Government:      DAVID MITCHELL STEWART, AUSA
15                            U.S. Attorney's Office
                              P.O. Box 2017
16                            Augusta, GA 30903
                              (706)724-0517
17

18   For the Defendant:      PETE THEODOCION, ESQUIRE
                              J. Pete Theodocion, PC
19                            507 Walker St.
                              Augusta, GA 30901
20                            (706)722-3000

21
     Reported By:             RHEA RANGEL, Official Court Reporter
22                            Southern District of Georgia
                              1417 Troupe Street
23                            Augusta, Georgia 30904
                              (706) 823-6468
24

25
```

1                          I-N-D-E-X

2     **OBJECTIONS TO PRESENTENCE REPORT:**

3     Defense Argument as to Paragraph 5                    5
      **Court's Ruling as to Paragraph 5                    14**
4
      Defense Argument as to Paragraphs 19-22              18
5     Government's Argument as to Paragraphs 19-22         26
      Direct Examination of Robert Fields                 34
6     Questions by the Court of Robert Fields             39
      Cross-Examination of Robert Fields                  41
7     **Court's Ruling as to Paragraphs 19-22             47**

8     Defense Argument as to Paragraphs 10, 14, 16, 26, 27  51
      Direct Examination of Todd Baldwin                  55
9     Cross-Examination of Todd Baldwin                   68
      Questions by the Court of Todd Baldwin              81
10    Cross-Examination of Todd Baldwin Continued         82
      Redirect Examination of Todd Baldwin                84
11    Recross-Examination of Todd Baldwin                 85
      Defense Argument                                    86
12    Government's Argument                               90
      **Court's Ruling as to Paragraphs 10, 14, 16, 26, 27   95**
13

14    **ARGUMENTS IN MITIGATION OF SENTENCE:**
              By Mr. Casey Stephens                       104
15            By Mr. Jerry Campbell                       106
              By Mr. Henry Chambers                       107
16            By Mr. Pete Theodocion                      109
              By the Defendant                            113
17

18    **ARGUMENT BY THE GOVERNMENT:**                     114

19    **RULING BY THE COURT:                              117**

20            Sentence:                                   120

21

22

23

24

25

1
```
 1                    P-R-O-C-E-E-D-I-N-G-S

 2              (Court called to order at 9:03 a.m.)

 3              THE CLERK:  Good morning.  This morning we're here to

 4    conduct the sentencing in the case of United States of America

 5    versus Daniel Webster Cason; Criminal Action Number CR108-099.

 6    All parties are present and ready to proceed, your Honor.

 7              THE COURT:  Thank you.

 8              Good morning, everyone.  The Court notes the

 9    appearances as follows:

10              Mr. David Stewart on behalf of the United States

11    Government.  Mr. James Pete Theodocion on behalf of the

12    defendant.

13              And are you Daniel Webster Cason?

14              THE DEFENDANT:  Yes, sir.

15              THE COURT:  And the Court notes that the defendant,

16    Mr. Daniel Webster Cason, has, by that response, indicated that

17    he is present in the Court today.

18              Daniel Webster Cason appeared before this Court on

19    March 31st, 2009, accompanied by his attorney, James Pete

20    Theodocion, for a Rule 11 Proceeding.  Pursuant to a plea

21    agreement, the defendant pled guilty and was adjudged guilty of

22    Counts Three, Five and Eleven of the indictment, charging him

23    with false statements in violation of 33 United States Code

24    Section 1319(c)(4).

25              Upon completion of the Rule 11 Proceeding and the
```

4

1    Court's acceptance of the guilty plea, the Court directed the

2    probation office to prepare a Presentence Report and to

3    disclose the report to the Government and the defendant.

4          Mr. Theodocion, have you and Mr. Cason had an

5    opportunity to read and to discuss the Presentence Report?

6          MR. THEODOCION:  Yes, your Honor, we have.

7          THE COURT:  I note, Mr. Theodocion, that you have

8    filed a number of objections to the report.

9          MR. THEODOCION:  Yes, sir, your Honor.

10         THE COURT:  And those are attached as an addendum to

11   the Presentence Report.  Are all of those still active

12   objections?  Has any success been made by you and the

13   Government to whittle these down, or are they still all active

14   objections that we need to address this morning?

15         MR. THEODOCION:  I think they're all active, your

16   Honor.  I'm not sure all of them need to be addressed.  Some of

17   the points I made responded to -- they didn't necessarily go

18   into the computation of the guideline range.

19         THE COURT:  Okay.

20         MR. THEODOCION:  But the ones that do, certainly, we

21   need to address them.

22         THE COURT:  All right.  Well, let's go through this

23   then one at a time.  Your first objection, Mr. Theodocion, is

24   to Paragraph Five in which you appear to dispute the

25   application of the Clean Water Act.  Specifically, your notion

1   that the stream is not a navigable water under the Clean Water

2   Act.  Is that an issue you wish to address?  And, quite

3   frankly, in looking at the response from the probation office,

4   I tend to agree with her in that Mr. Cason signed a plea

5   agreement and the factual statement that stated that he

6   knowingly made false material statements in reports and records

7   required to be filed or maintained under the Clean Water Act.

8   It seems to me he's acknowledging the CWA does apply.  And

9   furthermore -- go right ahead.

10          MR. THEODOCION:  Okay.

11          THE COURT:  Furthermore, he's pled guilty to filing

12   false statements.  We're not pleading guilty to, specifically,

13   the violations of the Clean Water Act.  Is that correct?

14          MR. THEODOCION:  We -- Judge, that is correct.  But

15   what we have here, you know, in total we've got a 17-level

16   computation.  Ten of those 17 levels, which involve one

17   incident on or about January 29th of 2004, involve the

18   discharge into a tributary of a creek which flows into the

19   Savannah River.  So for purposes of that incident in

20   particular, we do want to bring up this issue.

21          Under the Clean Water Act, if a, in this case the

22   Georgia Department of Natural Resources its Enviromental

23   Protection Division, they make a determination if the body of

24   water applies.  And then based on that, they require you as a

25   condition of your permit to discharge pollutants to file

1   certain reports.  I do think you can make a distinction

2   between, you know, the mechanisms under the Clean Water Act

3   that lead to these determinations of permits and waters require

4   filings, but still maintain the right to dispute the fact that

5   if you're discharging pollutants into a specific piece of water

6   that that is a water of the United States.  You really couldn't

7   expect a person to not cooperate with state filing requirements

8   on the hopes that later maybe he could challenge jurisdiction

9   under the Clean Water Act altogether.

10          It's, to speak broadly about that Act, your Honor,

11   you know, that Act basically delegates to -- you know, Congress

12   when they did the Clean Water Act, they can't name every piece

13   of water obviously.  They end up delegating to the United

14   States Court of Engineers.  I believe there are 40 states that

15   have the power under that Act to grant permits under the Clean

16   Water Act.  And so the issue of whether a piece of water, even

17   once it's determined by, in this case, the State Department of

18   Natural Resources that the Clean Water Act applies, that's

19   still an issue of fact.

20          And it's important here, Judge, because clearly the

21   most serious violation charged in this indictment was that

22   discharge.  The record keeping acts have a maximum two years

23   confinement per count.  Clearly the most serious charge that

24   was that discharge.  There was a significant issue of fact as

25   to whether or not the stream, the tributary in which the

1    discharge occurred, the Government would have had jurisdiction.

2    And, of course, in front of a jury they would have had to prove

3    that beyond a reasonable doubt.  So in a lot of ways this case

4    is sort of a microcosm of a lot of the concerns and problems

5    with the sentencing guideline structure itself because we're

6    here today under a different standard of proof.

7            And if I could go further, I don't know if your Honor

8    wants me to stop there, but just regarding jurisdiction, Judge,

9    real briefly.  Again, at this point in time there is no clear,

10   you know, indication from the Supreme Court on exactly how you

11   make that determination.  We're at a point now where I believe,

12   most recently, in a case that came out of the Eleventh Circuit,

13   *United States versus McWane*, the Justice Department asked the

14   Supreme Court to review that case to clear up the confusion

15   over what the definition of waters of the United States is.

16   That all came out of the Rapanos decision.

17           And again, Judge, just briefly, in that case, you

18   basically had a four justice plurality which made a

19   determination of what water of the United States was, what was

20   required.  You had a fifth justice that joined in, but there

21   was never a majority of justices that actually defined what it

22   was.  Justice Scalia wrote the opinion which was joined by the

23   Chief Justice Roberts, Justice Thomas and Justice Alito.  He

24   wrote the opinion and basically mocked, I mean he mocked the

25   expansion of federal jurisdiction by states, in this particular

1   case, the Army Corps of Engineers, and just commented over and

2   over again how they're trying to grab every piece of water

3   there is out there.  You know, their jurisdiction under the

4   Clean Water Act comes as so much of their claimed jurisdiction

5   does over commerce laws.  And the Savannah River is an

6   interstate piece of water.  That's one thing.  But they want to

7   go further and further and further to claim wetlands, in this

8   case an unnamed tributary that goes into a creek that goes into

9   the Savannah River.  So the question is, what kind of

10  connection is required.

11          In talking about -- commenting on a case, *Solid Waste*

12  *Agency v. United States Army Corps of Engineers*, which is 531

13  U.S. 159, Justice Scalia wrote that, even after that case:

14          "The lower courts have continued to uphold the

15  core's" -- in this case he was dealing with the Corps of

16  Engineers -- "sweeping assertions of jurisdiction over

17  ephemeral channels and drains as tributaries.  For example,

18  courts have held that jurisdictional tributaries include the

19  intermittent flow of surface water through approximately 2.4

20  miles of natural streams and man-made ditches under I-64, a

21  roadside ditch, whose water took a winding 32-mile path through

22  the Chesapeake Bay, irrigation ditches and drains that

23  intermittently connect to covered water and, most implausibly

24  at of all, the washes and of an arid development site located

25  in the middle of the desert through which water courses during

1   periods of heavy rain."

2               They just frowned upon the expansion of the

3   jurisdiction and what lower courts have done.  Concluded, and

4   he was joined again by Roberts, Alito and Thomas, just four of

5   the justices.  He concluded:

6               "And some on its only plausible interpretation

7   the phrase waters of the United States includes only those

8   relatively permanent, standing or continuously flowing bodies

9   of water forming geographic features that are described in

10  ordinary parlance as streams, oceans, rivers and lakes.  The

11  phrase does not include channels through which water flows

12  intermittently or ephemerally or channels that periodically

13  provide drainage for rainfall."

14              And so given that, what they've done, Judge,

15  they've had a survey done.  What the Government did in

16  anticipation of trial, realizing that they were going to have

17  to show a connection with that piece of water and interstate

18  water, in this case the Savannah River.  They had the United

19  States Enviromental Protection Agency, Region Four, Science and

20  Ecosystem Support Division did a report based on analysis of

21  the water on August 4th and 5th of 2008, some four-and-a-half

22  years after the incident on January 29th, 2008.  And we would

23  enter this into the record.  I don't think the Government has

24  an objection.

25              The conclusion of this report, Judge, in Section

1    Six:

2              "The receiving water at the Harlem Wastewater

3    Treatment Plant is a perennial headwater stream.  Cumulatively,

4    headwaters have well-known effects on the physical, chemical

5    and biological integrities of downstream waters.  The subject

6    stream segment has all the characteristics typically associated

7    with forested headwaters in the southeastern plain.  Given

8    these characteristics and given the known relationships between

9    the headwater and rivers and similar watersheds, it is highly

10   likely that the subject segment has such effects, ultimately,

11   on the Savannah river.  Additionally, the stream is in a

12   landscaped position relative to the site to receive surface

13   water flows from the border of the wastewater treatment plant

14   site."

15             So the conclusion was, basically, hey, it shares

16   a lot of characteristics of these other waters.  Given all

17   these things, these known relationships, it is highly likely

18   that this subject segment of water has those effects on the

19   Savannah River.  And, of course, when you're in front of a

20   jury, and you're trying to prove something beyond a reasonable

21   doubt, "highly likely" oftentimes can't get you there.  And,

22   again, here, we're facing a preponderance of the evidence where

23   it certainly can.  And that's what's so worrisome in this case

24   is that then it's, in effect, such a bottom-up situation where

25   the 10 levels of the 17, basically the entire, you know, the

1   brick and mortar of this particular sentence is based on an

2   incident which, if in front of a jury, jurisdiction would be

3   highly questionable that it could be proved.  And it's much

4   stronger in a case like this with a lower burden.

5            Based on the uncertainty as to what the

6   definition of United States water is, and not surprisingly,

7   there's been a bill introduced this year in Congress where they

8   actually do want them to define it as any piece of water, be it

9   a completely intrastate, which is no surprise.  But right now,

10  there is such uncertainty.  We have to leave that objection in

11  the record going forward.  And I did want to at least make

12  those concerns known to the Court regarding the lower standard

13  of proof here and how that affected what really amounted to the

14  real meat and potatoes charge in this indictment.  And that's

15  all I've got on the jurisdiction right now, Judge.

16           THE COURT:  All right.  Let me allow Mr. Stewart to

17  respond then.  Can I see that report by the way.

18           MR. THEODOCION:  Yes, sir.  And I'll introduce it.

19  If I can have this marked as Defendant's Exhibit 1.

20           THE COURT:  That will be fine.

21           Mr. Clerk.

22           MR. THEODOCION:  And I don't think there will be any

23  objection to having that introduced as evidence.

24           THE COURT:  Mr. Stewart, how would you like to

25  respond to the issue of jurisdiction under the Clean Water Act?

1          MR. STEWART:  Well, your Honor, we share the view of

2    the probation officer as the Court has indicated.  The view

3    that Mr. Cason has come in here and pled guilty to the Clean

4    Water Act.  And what is the jurisdictional hook, in the

5    lawyer's parlance, that gets us here in federal court?  Why is

6    it that the Clean Water Act applies?  Well, it applies because

7    we're talking about waters of the United States.  And the

8    defendant came in voluntarily, without coercion, and pled

9    guilty to violating the Clean Water Act.

10          And while I understand the, you know, the discussion

11    of the interpretation of the Clean Water Act and navigable

12    waters and waters of the United States, and I certainly agree

13    with Mr. Theodocion that the *Rapanos* decision from the United

14    States Supreme Court is not what you would call a model of

15    clarity.  That's beyond the point.  The defendant has come in

16    and pled guilty, he's been examined by yourself, your Honor,

17    and knowingly and voluntarily pled guilty to violating the

18    Clean Water Act, three counts of the Clean Water Act.  And so,

19    while I understand why he wants to note on the record feelings

20    about the scope of the Clean Water Act, it's besides the point.

21          But more importantly, I was thinking about this last

22    night trying to draw an analogy.  It's a federal crime, for

23    example, to go falsify bank records because -- what's our

24    jurisdictional hook on that?  Well, FDIC insured.  All these

25    banking regulations, it's because there's a jurisdiction hook.

1    If there wasn't a jurisdiction hook then why file the reports,

2    why -- they're just not subject to federal law.  So if you

3    plead guilty to falsifying bank records, for example, you've

4    admitted that jurisdiction applies.  And then to come in at

5    sentencing and to say, well, the bank is not FDIC insured, for

6    example.  Or if somebody came in and robbed that bank but said,

7    it's not FDIC insured, but he's already admitted that federal

8    law applies, it just doesn't make sense then at sentencing to

9    say, well, there's no jurisdiction hook.  There is in this

10   case.

11           We have no objection to the scientist report coming

12   in, your Honor, because the standard set by the controlling

13   opinion according to the Eleventh Circuit is Justice Kennedy's

14   opinion in the *Rapanos* decision which talks about chemical,

15   biological and physical connections between the receiving

16   waters, in this case the body of water that's right next to the

17   wastewater treatment plant out there in Harlem and the Savannah

18   River which is navigable in fact.  You can take a boat down to

19   the ocean on the Savannah River.  And the scientist reports

20   there, he went out and walked the stream, looked at the

21   biological components, the chemical components, the physical

22   components and said this connection exists.  And so we have no

23   problem with that report coming in because we believe it

24   exists, and that was a factual basis upon which the defendant

25   could plead guilty to the Clean Water Act.

1            And finally, as a matter of common sense, who builds

2    a wastewater treatment plant next to a body of water that is

3    not capable of carrying away the treated wastewater?  I mean

4    this is a wastewater treatment plant for the City of Harlem.

5    You don't put it off on some isolated waterway that just

6    doesn't have a physical, chemical, or biological connection to

7    a major body of water.  That's just common sense.  You've got

8    to be able to carry these things away.  So in this case, the

9    Clean Water Act applies.  Jurisdiction is proper.  And

10   defendant has already acknowledged that.  And that's the

11   Government's position on the matter.

12           THE COURT:  Thank you.

13           Gentlemen, what I'm going to do during this hearing

14   today is I'm going to hear arguments and testimony or other

15   evidence from you on each of these objections.  And then what I

16   will do is I will render my findings and conclusions along the

17   way rather than waiting until the end of all of these and

18   entering findings of fact and conclusions as a group.

19           So as it relates to Defendant's Objection Number One

20   to Paragraph Five of the Presentence Report, specifically, the

21   objection or the dispute that the perennial stream running

22   along the Harlem Wastewater Treatment Plant is water of the

23   United States and thus within the enforcement of the Clean

24   Water Act, the Court has listened to the argument of counsel

25   for the defendant and for the Government.  The Court has

1    reviewed the probation officer's response thereto.

2              In addition, the Court has reviewed what will be

3    marked Defendant's Exhibit One which is a final report prepared

4    by the United States Enviromental Protection Agency on the

5    Harlem Wastewater Treatment Plant, Ecological Evaluation of the

6    receiving water, dated August 4th through 5th, 2008.  The Court

7    notes that on Page Six of the report, in conclusions marked

8    Section 6.0, that the conclusion is that the receiving water at

9    the Harlem Wastewater Treatment Plant site is a perennial

10   headwater stream.  It notes that given the characteristics of

11   the stream and the known relationships between headwaters and

12   rivers and similar watersheds, it is highly likely that the

13   subject segment has the necessary effects on the Savannah

14   River.

15             The Court believes that based upon the

16   preponderance of the evidence standard that these conclusions

17   support the position by the Government and the Enviromental

18   Protection Agency that the headwater stream which is a

19   tributary of the Euchee Creek, again, which affects the

20   Savannah River, is a water of the United States and is thus

21   maintained under the purview of the Clean Water Act.

22             The Court further finds that notwithstanding

23   this finding, that in the factual basis to the defendant's plea

24   agreement, in this particular case, the defendant acknowledged

25   that the records and reports that he filed were both filed and

1    maintained under the Clean Water Act.  Therefore, the Court

2    finds that the defendant himself has acknowledged the

3    application of the Clean Water Act in this particular case.

4    Therefore, the objection based on these findings is overruled.

5              Now, Mr. Theodocion, let's address the objection

6    that you've raised to Paragraph Seven.

7              MR. THEODOCION:  Judge.  I'm sorry, your Honor.

8              THE COURT:  Go right ahead.

9              MR. THEODOCION:  That would be one which I don't

10   think needs to be taken up for the purposes of the sentencing

11   hearing.  Paragraph Eight as well.  I feel like all we need to

12   do is focus on the objections that directly relate to the

13   application of the guidelines.  Which the remaining ones, we

14   did not dispute the base offense, of course.  So we had,

15   basically, there were four enhancements.  We did not dispute

16   the public trust.  So we're left with the discharge of the

17   pollutant into the stream, six levels.  The four-level increase

18   for the discharge either without or in violation of a permit.

19   In this case, it would be in violation of as opposed to

20   without.  And then the two levels for obstruction.  Those

21   three.

22             If I could, Judge, maybe just, because I think we're

23   going to have a lot more to discuss with regard to the

24   discharge, perhaps I could take up about the obstruction at

25   this point.

1          THE COURT:  Yes, that will be fine.  For the purpose,

2     though, of kind of developing our record, Mr. Theodocion, I

3     want to make sure, then, as it relates to the objection to

4     Paragraph Seven, is it my understanding that the parties are in

5     agreement that this does not affect the application of the

6     guidelines or the sentencing?  So that particular objection

7     does not need to be addressed; is that your position?

8          MR. THEODOCION:  I believe that is the case.

9          THE COURT:  Do you agree with that?

10          MR. STEWART:  I agree with Mr. Theodocion that an

11     appropriate way to go forward is to focus on the objections

12     that affect the guideline calculation.

13          THE COURT:  All right.  So the objection to Seven,

14     which we have Number Two in our addendum, then, that one does

15     not need to be addressed, correct?

16          MR. THEODOCION:  That is correct, your Honor.

17          THE COURT:  And then as it relates to, you said

18     Paragraph Eight, which is Number Three in our addendum to the

19     Presentence Report, likewise, we do not need to take that up

20     because it does not affect the calculation of the guidelines,

21     correct?

22          MR. THEODOCION:  Correct, your Honor.

23          THE COURT:  Then as we -- well, are there any others?

24     Specifically point out to the Court so that we can reflect it

25     in the record then, the objections that are at this point moot,

1   if you will, because they do not affect the application of the

2   guidelines in your mind.

3          MR. THEODOCION:  I believe that Number Four, which

4   refers back to Paragraph Nine in the Presentence Report, that

5   that is going to be addressed in my Number Five.  So

6   specifically just to focus on Paragraph Nine won't be

7   necessary.  So we're left with my Number Five regarding

8   Paragraphs 10, 14, 16, 26 and 27.

9          THE COURT:  Okay.

10          MR. THEODOCION:  Your Honor, my Number Seven I don't

11   believe is necessary to take up on its own.  If I could just

12   double-check that, Judge.

13          THE COURT:  Go right ahead.

14          MR. THEODOCION:  That is correct.  I withdraw Number

15   Seven.  So I'm left with my Number Five which deals with the

16   discharge allegations and then my Number Eight which deals with

17   obstruction of justice.

18          THE COURT:  All right then, let's take up Eight, the

19   obstruction of justice.

20          MR. THEODOCION:  Judge, obviously, we're dealing

21   with, in this case, the two-level enhancement for obstruction

22   of justice.  That's primarily based on, as you see in

23   Paragraphs 19 through 22 of the Presentence Report.  On June

24   the 2nd, the grand jury was meeting in Savannah on June the 3rd

25   of 2008.  A subpoena was served on a Robert Fields who at that

1    time was the head operator of the Harlem Wastewater Treatment

2    Plant.  And he served in the capacity of Assistant Director of

3    Public Works.  Subpoena was served on him at approximately

4    10:30 a.m. on the 2nd of June of '08 -- and that is from

5    Presentence Report Addendum, Page Seven -- for grand jury in

6    Savannah the next morning.

7            And through Robert's -- Mr. Field's, excuse me, grand

8    jury testimony and interviews with agents, I mean, he described

9    what amounts to a very hectic situation with dealing with,

10   first, telephoning Daniel Cason, contacting attorneys at the

11   Fulcher Hagler Law Firm, contacting City Administrator Jean

12   Dove to try to gather all these things to be in Savannah,

13   Georgia the next morning for grand jury testimony.

14           According to the Presentence Report, the documents

15   which -- and I'm on the addendum right now, your Honor, Page

16   Six.  Ms. Mitchell indicates that of the documents which are

17   "of importance," are:

18           Number One, the as-builts for the Harlem Wastewater

19   Treatment Plant.

20           Number Two, receipts for rental equipment.

21           And Number Three, 2002 through 2004 operators logs.

22           Those were documents that Mr. Fields arrived in

23   Savannah without.  And I'll take them one by one, Judge.

24           First of all, regarding the as-builts.  As-builts are

25   kind of the difference between a blue print before you start

1    the construction project and how the thing is actually built.

2    As built.  And this is a treatment plant that, going back, is

3    either 40 and 50 years old.  It's been modified and developed

4    over time.  And as you go forward over time, the as-builts are

5    added onto.  And so what, in grand jury testimony of

6    Mr. Fields, he basically describes just a lot of different

7    plants.

8          THE COURT:  Excuse me.  I don't mean to interrupt

9    you.

10          Do you have an objection?

11          MR. STEWART:  I apologize for interrupting.  The

12    Government has no issue with the as-builts and also the rental

13    equipment.  So if it saves counsel time.  But I apologize for

14    interrupting.  As far as the Government is concerned we can

15    just focus in on the operators log for the years 2002 to 2004.

16          THE COURT:  Is that okay, Mr. Theodocion?

17          MR. THEODOCION:  That will be fine, your Honor.  That

18    will certainly save us time.  And we agree with the Government

19    that there was no -- that Mr. Cason had nothing to do with the

20    absence of --

21          THE COURT:  All right.  So we can focus on the

22    operator logs for that period.

23          MR. THEODOCION:  Yes.  Operator logs from 2002

24    through 2004.  And I do want to, I know we're not going there,

25    but I think it's sort of -- it's all kind of part and parcel

1    with going back to those two things though.  Just the nature of

2    these documents.  You had documents that you have at the plant,

3    documents at City Hall.  You had documents that nobody knew

4    where they were.

5            I wanted to point out that, in fact, according to the

6    depositions of Ted Stack, who is a State of Georgia

7    Environmental Protection Division Program Manager, who is based

8    in this area, he gave us a deposition in a civil case in 2008

9    where he noted that he took flowcharts in 2004, took originals

10   from the plant, and as of June 5th, 2008, no one had any idea

11   where they were.  He took the original flowcharts showing the

12   flows.  He did not take a receipt -- he did not give the City

13   of Harlem a receipt for his taking of those documents.  And at

14   the deposition he said that there was nothing in writing

15   acknowledging receipt of the original documents.  At that time

16   he was asked:

17           Do you know where the circular flowcharts are today?

18           No, I wish I did.

19           To your knowledge are they lost?

20           I don't know if they're lost or not.

21           And so you had documents that otherwise might have

22   been pertinent to this that were lost by the State of Georgia.

23   In any event, Judge, Mr. Fields gave deposition testimony where

24   he described a very, very hectic situation in interviews with

25   on August the -- kind of going back, he testified in front of

1    the grand jury on two occasions.  He went down in June or,

2    excuse me, what I said before, yeah, on June the 3rd of '08

3    without those documents.  They brought him back in July of '08,

4    and he still did not have the documents.

5            In his grand jury testimony, he's told as he's going

6    through the process, at some point, I believe it's Assistant

7    United States Attorney Bourne tells him, we need to cut this

8    thing off.  You need to get your own attorney.  There's an

9    attorney there with the City of Harlem.  He was -- Mr. Field's

10   was told, this has gone far enough.  You need to get your own

11   attorney.  In between, after that date, he did obtain private

12   counsel.  He reached a proffer agreement.  And then in August,

13   shortly thereafter, he actually came in with those logbooks.

14           I do want to go over what the various individuals

15   told us occurred, Judge, subsequent to that June the 2nd

16   subpoena with the logbooks.  Now, I'm going from the

17   Environmental, the EPA, criminal investigation division report.

18   It looks like they call it Form 008.  It would equate to an FBI

19   302.  The missing logbooks contained a 2002, 2003 and up to

20   April 2004.  All that was in one spiral-bound notebook.  Mr.

21   Fields was served the subpoena in early June.  He indicated

22   that he called Daniel Cason, Director of Public Works.  Most of

23   the documents requested were found at the plant and Fields, not

24   Cason, made photocopies of some of the documents at the plant.

25   Fields found two operator logbooks ranging from 2002 through

1   2006.

2          Continuing on, Fields, not Cason, carried all of the

3   documents found including the logbooks to Fields' work vehicle,

4   a white Crown Victoria.  And Fields put the documents in the

5   backseat.  The documents and logbooks were not in a bag or a

6   box or any container.  Fields then drove his Crown Victor with

7   the documents to the Administration Building for the City of

8   Harlem.  And Cason also drove there separately in his work

9   vehicle.

10         At this point, according to Fields, he, Cason, City

11  Administrator Jean Dove and Renee Martin, Dove's assistant,

12  began photocopying documents.  Cason did not do any -- and I'm

13  leaving out some words, Judge.

14         THE COURT:  I understand.

15         MR. THEODOCION:  Cason did not do any photocopying

16  and may have been removing staples from documents so they could

17  be photocopied.  Fields doesn't specifically recall the

18  logbooks being photocopied.  The documents were placed in a box

19  by Fields, put in an office in the Administration Building

20  shared by Fields and the mayor.  Everyone left the

21  Administration Building at 7:00 p.m. or 7:30 p.m.  Dove,

22  Martin, Jerry Campbell, Fields, the mayor and Bea Doody,

23  secretary, had keys to the Administration Building, not Cason.

24         The next day at approximately 8:30 a.m. Fields

25  arrived at the Administration Building.  Fields thumbed through

1   the box but didn't take a detailed inventory.  Fields believed

2   everything was in the box that he and others had found and

3   copied.  Fields thinks that Martin was in the Administration

4   Building when Fields picked up the box of documents.  Fields

5   put the box in the back of his Crown Victoria and left to meet

6   with his attorney in Waynesboro near the Lakeview Diner.

7           Now, this all occurred, this is his recollection of

8   what happened in June when he got the subpoena to be at grand

9   jury the next day.  And as I indicated, he then went back to

10  grand jury later on in the year.  Subsequent to that, around

11  mid-July, this is after his second appearance when he was told,

12  you need to get a lawyer, and in fact he did obtain a lawyer.

13  Around mid-July, Fields was at the plant with Cason, and he

14  told Cason that they absolutely have to find the missing

15  logbook.  Cason then told Fields that he had a copy of the

16  missing logbook and provided Fields with that copy.

17          Fields asked Cason why he had copies of that logbook,

18  and Cason said the copy was made when Ted Stack of the Georgia

19  EPD came to the plant and took some flowcharts and possibly

20  that logbook, or copy, was made when Attorney Lee Bennett of

21  the Fulcher and Hagler Law Firm was taking documents due to

22  civil litigation.  So after being told on July 8th that he

23  needed an attorney, in mid-July after obtaining an attorney and

24  getting his proffer agreement, he then came back and came in

25  with the logbooks and said, well, I told Daniel Cason we needed

1    them and he gave me a copy.

2              According to Jean Dove, who was also asked about what

3    happened on the 2nd, she believed that the documents were

4    brought over to her office to be copied sometime after lunch

5    that day.  Beverly Martin left at 5:00 p.m. and Dove continued

6    copying the documents and putting some in manila envelopes with

7    the assistance of Fields until about 7:30 p.m.  Cason was also

8    present but didn't assist much in this process.

9              According to Renee Martin, the Administrative

10   Assistant to the City of Harlem, in her interview on July 14th,

11   2008, she said, Martin does not remember who searched for the

12   document and she doesn't remember who brought her the documents

13   to be copies, but is pretty sure it wasn't Daniel Cason.  Later

14   she said that she didn't recall Fields making any comments

15   about Cason assisting in the search for the documents.  Martin

16   doesn't recall Cason assisting at all.

17             So basically, Judge, what we have in the record are

18   documents which numerous people could have possibly had access

19   to.  No one, at least not the record we've seen so far, not in

20   grand jury testimony, other than what I said, is it ever said,

21   well, Daniel Cason had those logbooks or Daniel Cason took

22   those logbooks.  So there's no direct evidence whatsoever.

23   What it amounts to is a situation where the two people that one

24   would have to say, if there is something to hide in those

25   logbooks, Mr. Fields and Mr. Cason -- at some point the

1    documents were produced.  But at the time of the subpoena, both

2    of them were in jeopardy.  Mr. Fields had not been told, you're

3    not a target here.  If he had, I'm not aware of it.  I know

4    eventually he had to obtain a lawyer and get a proffer

5    agreement.

6            And so, basically, according to the Presentence

7    Report, it ends up coming down to, well, the documents were

8    missing; therefore, it must be Daniel Cason that took them.

9    That's the extent of it.  And we would offer at the very least

10   as of June the 2nd, 2008, Mr. Fields possibly could have had

11   just as much incentive to get rid of the documents as Mr. Cason

12   or anybody else.  But most importantly, there's just no direct

13   evidence whatsoever that attaches Daniel Cason to the fact that

14   those documents were missing.  And, in fact, according to

15   Mr. Fields, he came back and was able to get copies of the logs

16   from Mr. Cason himself.  And so we don't think the evidence is

17   here, Judge, to warrant the two-level enhancement for

18   obstruction.

19           THE COURT:  Thank you.

20           Mr. Stewart, he makes a very compelling argument on

21   that issue.  What do you say?

22           MR. STEWART:  Well, your Honor, getting to his

23   statement about the record.  I ask for the Court's direction on

24   how to proceed on this.  The probation officer in recommending

25   this enhancement relied upon the grand jury transcripts and the

1    two reports of interviews by the P.A. agent and Mr. Fields.

2    And, respectfully, the totality of those documents paints

3    somewhat of a different picture of what occurred regarding the

4    missing logbook that went missing after receipt of a grand jury

5    subpoena, the location of the logbook, the logbook that covers

6    the time period of the pumping that we're talking about, and

7    the time period when Robert Fields wasn't even working there.

8    It's stuff documenting stuff that occurred before Robert Fields

9    was even working for the City of Harlem.

10          That logbook was taken to City Hall for copying, the

11   Administration Building.  Robert Fields and Daniel Cason are

12   carrying those documents into City Hall.  So Robert Fields has

13   it; it's in his car.  And then from the moment from his car to

14   where it was being copied by Jean Dove, the secretary, Renee

15   Martin, and with Mr. Cason there, it never got there because,

16   as Mr. Theodocion has indicated, Renee Martin and Jean Dove

17   never saw that notebook.  But we have the sworn testimony of

18   Robert Fields that he had that notebook.  That notebook was in

19   his possession up until the moment when they got to City Hall

20   and Daniel Cason and Robert Fields started carrying the

21   documents up to City Hall.

22          So Mr. Theodocion is correct.  We agree, there is no

23   direct evidence.  There is no security camera video of

24   Mr. Cason slipping a logbook into his jacket or anything like

25   that.  But it's the same as, you have two individuals who walk

1    into a room.  Somebody is holding an object.  The lights go

2    off.  The lights come back on.  The object is missing.  Well,

3    there's two people there.  Where did it go?  And so as a matter

4    of a circumstantial case by a preponderance of the evidence,

5    who has any motive to get rid of that logbook?  Robert Fields,

6    who this logbook didn't even cover the time period that he was

7    there?  Or Mr. Cason, whose logbook covers the time period

8    where pumping was occurring?  The Government's contention,

9    where illegal pumping was occurring during that time period.

10          So as far as the record is concerned, we have the

11   memos and the grand jury transcript.  Mr. Fields is sitting out

12   in the hallway with his attorney, Richard Allen.  And so the

13   Government says that it really comes down to Robert Fields'

14   testimony.  Because we have what Mr. Fields has said, and he

15   has consistently said that he had that logbook for the years in

16   question.  There were two logbooks, one that we received in

17   response to the subpoena and one that we never received.

18          Because, as Mr. Theodocion said, Robert Fields went

19   back to Daniel Cason and said, where is that logbook?  I was

20   just down at grand jury and they were grilling me on where this

21   missing logbook is.  And I had it.  And we went to City Hall

22   together, and now it's gone.  And Daniel Cason brings out some

23   papers, and this part in the interview of August 13th, 2008,

24   those papers that Mr. Cason showed to Robert Fields, Robert

25   Fields looks at those and says, those aren't the same papers.

1   That's not the same logbook that I had in my hand in response

2   to that subpoena, that I carried in my white Crown Victoria up

3   to City Hall and that you helped carry that along.  It wasn't

4   the same documents.  There are other documents that Mr. Cason

5   said were a logbook.

6           So the logbook has never been found, your Honor.  The

7   logbook that Robert Fields went, in response to a subpoena, and

8   pulled out of the wastewater treatment plant, put in his car,

9   drove up in caravan fashion to City Hall to photocopy and

10  unloaded with Daniel Cason.  We admit that there's no direct

11  evidence.  But, your Honor, this is a case of circumstantial

12  evidence where two people, one with a motive, one who doesn't

13  have a motive because it covers stuff where -- how could he be

14  criminally liable for what occurred in the time period covered

15  in the logbook? -- and then the logbook disappears.  That's

16  what this issue comes down to, your Honor.  Boiled down to the

17  simplest terms.

18          The Government supports the probation officer's

19  assessment of this.  She's reviewed the grand jury transcripts.

20  She reviewed all of these report, every sentence of them.  And

21  not every sentence was reviewed in the presentation to your

22  Honor today.  And so the Government submits that such an

23  enhancement is appropriate.

24          THE COURT:  Can I see those two memos that you're

25  referring to?

1          Mr. Theodocion, do you have any objection?

2          MR. THEODOCION:  I don't, Judge.  I do want to say I

3   don't think it's appropriate to, sort of, vouch for your

4   evidence based on, well, a probation officer looked at all this

5   stuff and she's made a determination; so, therefore, it

6   bolsters what we're trying to say.  I don't think that's an

7   appropriate line of reasoning.  But, absolutely, you can have

8   those, your Honor.

9          THE COURT:  Let me take a look at that a moment.

10          MR. STEWART:  Yes, your Honor.  Would you also like

11   the grand jury transcripts that talk about his--

12          THE COURT:  Please.  Let me see that.

13          MR. STEWART:  Your Honor, what I've handed up to you,

14   just to save trips back and forth--

15          THE COURT:  Okay.

16          MR. STEWART:  -- to the bench, those are all the

17   grand jury transcripts of the witnesses.  Those are the grand

18   jury transcripts that the defendant, the Government and the

19   probation officer have been working off of.  They have tabs on

20   them on top of the two reports that Mr. Theodocion was reading

21   from.  And there was an index, I think, that shows the page

22   numbers.

23          THE COURT:  All right.  What pages are you going to

24   refer me to now?

25          MR. THEODOCION:  Judge, we narrowed down to in the

31

1   June '08 deposition, Pages 32 through 34.

2           MR. STEWART:  The month of the grand jury transcripts

3   are at the bottom, at the bottom of the page.

4           THE COURT:  So I now have the June '08 transcript for

5   Mr. Fields.  And you said go to Page 32?

6           MR. THEODOCION:  Yes, your Honor.  Thirty-two through

7   34.

8           THE COURT:  Thirty-two through 34.  Okay.  I see

9   that.  Thank you.

10          As it relates to the July '08 testimony, what page

11  are you agreeing?

12          MR. THEODOCION:  Judge, that was Page 33 through 41.

13          THE COURT:  All right.

14          MR. THEODOCION:  Actually, Page 33 just lines 1

15  through 25, then Pages 37 through 41.

16          THE COURT:  Go to Page 39.  Let me get you to begin

17  on Page 39 of this July 8th transcript beginning on Line 22.

18          My question is, where did you last see those

19  notebooks?

20          Your answer was:  I believe those notebooks were down

21  at the waste treatment plant.  And they're either at that waste

22  treatment plant or the administrative office in Harlem.

23          Moving on to Line Seven.

24          Question:  Do you recall seeing those notebooks 2002

25  and 2003?

1          Answer:  During all that, that rush, I thought I did

2    see those notebooks.  When we left out of here, I went back to

3    look for those notebooks.  I could not find those notebooks at

4    all.

5          I guess my question is, that doesn't seem to be a

6    hundred percent certainty to me.

7          MR. STEWART:  Yes, your Honor.  As Mr. Theodocion

8    pointed out, at that point in the proceeding, Mr. Fields was

9    getting quite nervous.  He's out in the hallway, and he can

10   talk about this.  And he started to question, well, did I see

11   that.  He came in the month before, the day after he had that

12   logbook in his hands, and he testified, I know I had those

13   dates in question because I've thumbed through that notebook.

14         And then when he comes back and things are getting a

15   little tense in the grand jury room as we're grilling them on

16   that, he naturally gets a little nervous.  We say, you need to

17   get your own lawyer, advised him of his rights.  He went out

18   and got his own lawyer.  He got a proffer agreement.  We said,

19   we just want to find out what happened to those logbooks.

20   That's what we're after here, to find out what happened to

21   those logbooks.  So that's a crucial period of time in this

22   investigation.

23         So he gets an attorney, sits down with EPA agent in

24   August.  So, June grand jury, July grand jury, and then August,

25   and sits down in an interview setting and recounts through his

1    mind, as you read through that report, what happened.  And

2    based on the record in front of you, we believe that it's --

3    that it is by a preponderance of the evidence that Robert

4    Fields had that logbook.  He had that logbook, went up to City

5    Hall.  And from the Crown Victoria to the City Hall, those

6    documents which were carried in by Mr. Fields and Mr. Cason,

7    that logbook disappeared.  And Mr. Fields has gone everywhere

8    and looked everywhere as you read from the reports.  He can't

9    find it anywhere.  It disappeared.  How?

10           And so we feel, the Government's position is that, in

11   a circumstantial case, the conclusion that can be drawn by the

12   proper standard of proof in this proceeding is that Mr. Cason

13   caused them to disappear.  I wish we had video camera.  I wish

14   we had surveillance tape.  But we don't.  And, unfortunately in

15   life, that's how it is a lot of times.  But, like I said,

16   Mr. Fields is standing in the hallway if you have a question

17   for him as to whether he had those logbooks.

18           THE COURT:  I'd like to hear from him.  Thank you.

19           MR. STEWART:  All right.  We can call Mr. Fields.

20   Thank you.

21           THE CLERK:  Please raise your right hand.

22   GOVERNMENT'S WITNESS, ROBERT FIELDS, SWORN.

23           THE CLERK:  Please state your name for the record.

24           THE WITNESS:  Robert Fields.

25           THE CLERK:  Would you spell your last name.

1           THE WITNESS:  F-i-e-l-d-s.

2           THE CLERK:  All right.  And what is your position?

3           THE WITNESS:  Public Works Director for the City of

4    Harlem, Georgia.

5                        DIRECT EXAMINATION

6    BY MR. STEWART:

7        Q    Good morning, Mr. Fields.  My name is David Stewart.

8    I'm an Assistant United States Attorney.  We've met on prior

9    occasions, correct?

10       A    That's right.

11       Q    In fact, you came before the federal grand jury in

12   June of 2008, the day after you received a grand jury subpoena

13   for various records and documents from the Harlem Wastewater

14   Treatment Plant?

15       A    That's correct.

16       Q    And you testified before that grand jury in June of

17   2008 and then came back in July of 2008?

18       A    Yes, sir.

19       Q    And then after testifying before the grand jury in

20   July of 2008, you also sat down with an EPA agent, your

21   attorney, myself, and talked about various issues that had been

22   addressed in your grand jury transcript?

23       A    That's correct.

24       Q    And that occurred on -- over two days.  It was a

25   two-day -- on two separate occasions we sat down at the U.S.

1   Attorney's Office; is that correct?

2        A    That's correct.  That's right.

3        Q    And you're aware that reports were created from those

4   interviews that we had at the U.S. Attorney's Office?

5        A    Yes, sir.

6        Q    Mr. Fields, I'm just going to get right to it.  We're

7   talking today about some logbooks for the Harlem Wastewater

8   Treatment Plant.  You received a subpoena asking for the

9   operator logbooks for the wastewater treatment plant from 2002

10  through 2006, correct?

11       A    That's correct.

12       Q    How many logbooks did you find that covered that time

13  period?

14       A    I found two logbooks.

15       Q    And how do you know that they covered the time period

16  asked for in the subpoena?

17       A    The dates on the logbooks themselves.

18       Q    So you looked at the dates on the logbooks?

19       A    Yes, sir.

20       Q    So there were two logbooks that you found at the

21  wastewater treatment plant?

22       A    Right.

23       Q    And what did you do with those logbooks after you

24  found them at the wastewater treatment plant?

25       A    We took those logbooks from the wastewater treatment

1    plant to the City administrative buildings in Harlem.  And from

2    there, we made copies of documents.  Not sure if we made copies

3    of the logbooks, of the 2002/2004 logbook.  From there, they

4    were loaded up in a box, then taken down, the next morning,

5    taken down to Savannah.

6          Q    When you say "we" took those logbooks and other

7    records from the treatment plant to the administrative

8    building, who is "we"?

9          A    Myself and Daniel Cason.

10         Q    And whose vehicle did you put the logbooks in?

11         A    They were in my vehicle.

12         Q    And you drove your vehicle up to the administrative

13   building?

14         A    Yes, sir.

15         Q    And then did you and Mr. Cason carry in the documents

16   from your car to the Administration Building?

17         A    Yes, sir.

18         Q    And did you ever see that logbook from 2002 to 2004

19   ever again after that event?

20         A    No, sir.

21         Q    And you're certain you had a logbook for the years

22   2002 to 2004 that day that you got that subpoena?

23         A    Yes, sir.

24         Q    And you're certain that you drove it up to the

25   administration building?

1        A     Yes, sir.

2        Q     And you're certain that you've never seen it again

3   since then?

4        A     Yes, sir.

5        Q     Have you looked diligently to find it?

6        A     Yes, we have -- yes, I have.

7        Q     Did you talk to Mr. Cason about where that missing

8   logbook for 2002 through 2004 would be?

9        A     I did.  When I got back from the grand jury down in

10  Savannah, I said, we need to find that logbook.

11       Q     Did Mr. Cason give you any papers or something

12  claiming that it was that logbook?

13       A     He said we had copies of that logbook that were

14  confiscated by EPD in the past.  I'm not sure -- I don't know

15  the year.

16       Q     That was -- I'm sorry.  That was before you were

17  working for the--

18       A     That's right.

19       Q     -- treatment plant?

20       A     That's right.

21       Q     But if the logbook had been confiscated or taken by

22  the EPD or anybody else before you got there, how could you

23  have had it?

24       A     I remember seeing a 2002 and 2004 logbook.

25       Q     Did you get a chance to look at the documents that

1   Mr. Cason said was the logbook from 2002 to 2004?

2       A    I did.  I didn't do it in detail, but I did thumb

3   through the documents.

4       Q    Did those documents look like the logbook that you

5   had in your hand--

6       A    No.

7       Q    -- the day that you got the subpoena?

8       A    No, they didn't.

9       Q    Yet he said that was the logbook?

10      A    That's correct.

11      Q    2002 through 2004, were you working at Harlem

12  Wastewater Treatment Plant?

13      A    Started in August of 2004.

14      Q    All right.  The second logbook that you did actually

15  bring down to the grand jury, that started in April of 2004,

16  correct?

17      A    That's correct.

18      Q    And you're certain here today that you had a logbook

19  in your hands the day you got that subpoena that covered the

20  time period of 2002 through 2004?

21      A    That's correct.

22           MR. STEWART:  Your Honor, I think that goes right to

23  the heart of the matter.  Of course, if the Court has any

24  questions for Mr. Fields -- let me ask this question.

25

39

1   BY MR. STEWART:

2        Q    Did you get rid of that logbook for 2002 through

3   2004?

4        A    No, sir.

5        Q    And the only other person that was with you carrying

6   those documents into the administration building was Mr. Cason?

7        A    Yes, sir.

8        Q    Did you have your eye on Mr. Cason at all times--

9        A    No.

10        Q    -- when that was occurring?

11        A    No, I didn't.

12            THE COURT:  I have some questions.  Then I'll let

13   you, Mr. Theodocion.

14                    QUESTIONS BY THE COURT

15   BY THE COURT:

16        Q    Mr. Fields, thank you for coming today.  You are

17   absolutely certain that you took that logbook and put it in

18   your Crown Victoria; is that correct?  I don't want to put

19   words in your mouth.

20        A    From the treatment plant to the administrative

21   building.

22        Q    You are certain it was in your Crown Victoria?

23        A    Yes, sir.

24        Q    And when you arrived at the Harlem City Hall or

25   administrative building, you and Mr. Cason unloaded your Crown

1    Victoria.

2         A    I believe it was just me that unloaded the Crown Vic.

3         Q    All right.  So you're certain it went into the Crown

4    Vic?

5         A    Yes, sir.

6         Q    And now your belief is that you are the only person

7    that unloaded the Crown Vic?

8         A    Right.

9         Q    And you took the documents into the administrative

10   building and placed them on the counter, who was in that

11   administrative -- who was around the area where those documents

12   were dropped off?

13        A    Well, Renee Martin, the administrative assistant;

14   Jean Dove, the City Administrator; Mr. Cason; and myself.

15        Q    So you would bring documents in, lay them on a table

16   or a counter; is that correct?

17        A    Correct.

18        Q    Then you would go back out to your car to retrieve

19   more documents?

20        A    Yes, sir.

21        Q    So there were periods of time that you were not in

22   the building, you were either going to or from your car and

23   there was more than one person that would have had access to

24   the documents you were bringing in?

25        A    Yes, sir.

1      Q    Can you say unequivocally that no one else had the

2    opportunity to take that operators log?

3      A    Could you repeat that question, sir.

4      Q    Are you absolutely certain -- because what you've

5    just told me is that you were the person that brought the

6    documents in from your car.  You knew that log went into your

7    car.  You're the only person that brought those documents out

8    of your car into the administration building for copying.  Can

9    you say with certainty that the only person that had access to

10   that log while you were outside was Mr. Cason?

11     A    No, sir.

12     Q    You cannot?

13     A    No, sir.

14          THE COURT:  Mr. Theodocion, do you have any

15   questions?

16          MR. THEODOCION:  I do, your Honor.

17          THE COURT:  Thank you.

18                    CROSS-EXAMINATION

19   BY MR. THEODOCION:

20     Q    Good morning, Mr. Fields.

21     A    Good morning.

22     Q    Just briefly, could you just tell the judge, what is

23   in those logbooks.  What does a logbook mean?

24     A    The logbook, it's a book of daily happenings that we

25   write down, things that happened during the day, the times.

1      Q    Okay.

2      A    Just from a -- whatever goes on at the treatment

3    plant.

4      Q    Okay.  And none of the test work is in there?

5      A    No, sir.

6      Q    The test results?

7      A    No, sir.

8      Q    The type of reports like the fecal analysis, the TSS

9    analysis, the BODs.  All of those things that are furnished to

10   the State of Georgia, those test records aren't included in the

11   logbooks, are they?

12     A    No, sir.

13     Q    It's more of just, I showed up, I went around the

14   perimeter at 9:00 a.m.?

15     A    Yes, sir.

16     Q    That kind of thing?  Just things of your day.  Who

17   was there and, like you said, what you did; is that right?

18     A    That's right.

19     Q    And that's sort of a composition book; is it not?

20   Sort of about the size of this, right?

21     A    It's a notebook.  Just a spiral bound notebook that

22   we usually use.

23     Q    Spiral bound.  And this was May of 2008 when you got

24   the subpoena, right?

25     A    I'm not sure of the date.

1      Q     Okay.  But do you -- you don't -- when I say May of

2   2008, you don't dispute that, do you?  Does that sound right to

3   you?  Summertime?

4      A     Yes, sir.  Sometime in '08, I did get the subpoena.

5      Q     Okay.  And Mr. Cason didn't have on a jacket or

6   anything where he could have slid in a composition book, did

7   he?  He was wearing a shirt and pants, right?

8      A     I'm not -- I don't--

9      Q     Don't recall?  Okay.  But you did say you testified

10  today that you are certain you saw that particular book,

11  correct?

12     A     Yes, sir.

13     Q     Now, you did testify in front of the grand jury in

14  July of '08 the second time.  Do you remember that testimony?

15     A     Yes, sir.

16     Q     You were asked a question.  This is on Page 40,

17  counsel.  The question was:

18            Do you recall seeing those notebooks 2002/2003.

19            And your answer was:  During all that, that

20  rush, I thought I did see those notebooks.

21            Do you recall that answer?

22     A     I don't recall that, sir.  It's been.

23     Q     You don't dispute that that was your answer though,

24  do you?

25     A     I don't recall that.

1        Q     Okay.  It was a rush, wasn't it?

2        A     Yes, sir, it was.

3        Q     I mean, you had to be in Savannah the next morning,

4   correct?

5        A     Yes, sir.

6        Q     And so you're in Harlem that afternoon.  You've got

7   to make all those copies.  You've got to make arrangements to

8   get down to Savannah the next morning.  And you want to comply

9   with that subpoena, don't you?

10       A     Yes, sir.

11       Q     I mean, when you're served with a subpoena that says,

12  you have to have this, you have to have that, A, B and C, your

13  concern at that point is, if I show up without these things,

14  I'm going to be in trouble.  Right?

15       A     Yes, sir.

16       Q     Okay.  And so you get down there, and apparently you

17  don't have the '02 through '04 logbook, right?

18       A     That's correct.

19       Q     And you tell the grand jury, hey, I had it yesterday.

20  I thought I brought it with me.  Right?

21       A     Right.

22       Q     And you told that you took the books from the plant

23  in your vehicle to Jean Dove's office, right?

24       A     That's right.

25       Q     And Daniel was not in your car, was he?

1          A     No, he wasn't.

2          Q     And you just told the judge that you took the

3     documents from your car into the City Administrator's Office,

4     right?

5          A     Right.

6          Q     And you were never alone in there with Daniel, were

7     you?  I mean, Jean Dove and Beverly Martin, they were there the

8     whole time, correct?

9          A     That's correct.

10         Q     And isn't it true that they were the ones that were

11    really doing as far as most of the copying?

12         A     That's correct.

13         Q     And y'all were all in there together, right?

14         A     That's right.

15         Q     And I believe you indicated that the records were

16    placed in a box and placed in an office in the Administrative

17    Building that was shared by you and the mayor, correct?

18         A     That's correct.

19         Q     And you indicated that y'all left, everyone left,

20    around 7:00 or 7:30, correct?  Daniel didn't stick behind, did

21    he?

22         A     I don't recall.

23         Q     I mean, in your interview, when you interviewed with

24    Agent Carfagno in August, you said that all of y'all left,

25    right?

1        A    That's right.

2        Q    And Daniel didn't have a key to that office, did he?

3        A    No, sir.

4        Q    So the next day you came, thumbed through the box,

5    you believed everything was there.  And you took it down to

6    Savannah, correct?

7        A    That's correct.

8        Q    And we've heard testimony regarding a deposition that

9    was given by Ted Stack in July of 2008.  I realize July of 2008

10   is a couple months after May of 2008.  But there was civil

11   litigation going on with Mark Vaughn well before the time of

12   this grand jury subpoena; was there not?

13       A    I'm not sure, sir.

14       Q    Were you aware of the lawsuit that was--

15       A    Yes, sir.

16       Q    You were aware of the lawsuit that was dealing with

17   Mr. Vaughn's work out at the wastewater treatment plant,

18   correct?

19       A    That's correct.

20       Q    And as part of that lawsuit going back several

21   months, had you been involved in the process of taking

22   documents to and from your attorney's office, the City's

23   Attorney's Office?  Hadn't there been a process going on where

24   documents were moving in and out?

25       A    There might have been, but I wasn't involved in that.

1          MR. THEODOCION:  That's all I have, Judge.  Thank

2     you.

3          THE COURT:  Mr. Stewart, any followup?

4          MR. STEWART:  No follow up for this witness, your

5     Honor.  If he may be excused unless the Court has any further

6     questions for him.

7          THE COURT:  No.  He may be excused.

8          MR. STEWART:  All right.  You are free to go, Mr.

9     Fields.

10          THE COURT:  Thank you, Mr. Fields.

11          MR. STEWART:  Your Honor, I realize there's been

12     discussion regarding Jean Dove and Renee Martin.  I also have

13     those two reports of their interviews regarding the handling of

14     the photocopying on the day in question.  I believe

15     Mr. Theodocion has referenced that, and we're okay submitting

16     this to your Honor also.

17          THE COURT:  Go right ahead.  Sure.  Anything else?

18          MR. THEODOCION:  No, your Honor.

19          THE COURT:  The Court is now considering the

20     defendant's objection, which is Number Eight in the addendum to

21     the Presentence Report, as to Paragraphs 19 through 22 and 30;

22     specifically, the two-point adjustment for obstruction of

23     justice under Sentencing Guidelines Section 3C1.1.  The Court

24     notes that the language of that particular adjustment guideline

25     says that:

1            If the defendant willfully obstructed or impeded, or

2   attempted to obstruct or impede, the administration of justice

3   with respect to the investigation, prosecution or sentencing of

4   the instant offense of conviction, and the obstructive conduct

5   related to the defendant's offense of conviction and any

6   relevant conduct or a closely related offense, increase the

7   offense level by two levels.

8            Now, again, the Court notes that in this particular

9   case the standard to be applied is the preponderance of

10  evidence, which generally means enough evidence to make it more

11  likely than not that the fact sought to be proven is true.  The

12  Court has reviewed grand jury testimony transcripts from June

13  of 2008 and July of 2008 as it relates to the testimony of

14  Mr. Robert Fields, an operator at the Harlem Wastewater

15  Treatment Plant.  The Court has also listened to live testimony

16  offered by Mr. Fields.  And the Court, in fact, questioned

17  Mr. Fields as to certain issues related to the misplacement of

18  the operator logs for the years of 2002, 2003 and through April

19  of 2004.

20           The Court has also reviewed memos prepared by the

21  Criminal Investigation Division of the United States

22  Enviromental Protection Agency as it relates to conversations

23  with Ms. Renee Martin, an administrative assistant for the City

24  of Harlem, Georgia and Ms. Jean Dove, City Administrator for

25  the City of Harlem, Georgia, relating to their knowledge of the

1   assembling and copying of various documents covered by the

2   grand jury subpoenas, which would include the operator logs

3   identified and which are the subject of this objection and this

4   proposed adjustment.

5        The Court is concerned that, while Mr. Cason may have

6   been present during the assembling and the transport of these

7   documents, there were others also present.  Mr. Fields in his

8   live testimony and in response to questions by the Court noted

9   that the documents were taken from the wastewater treatment

10  plant and loaded into his Crown Victoria automobile, which he

11  alone drove to the City Hall or City Administrative Building.

12  His testimony was that he unloaded the car and delivered the

13  documents into the office.

14       His testimony was, though, that there were others

15  present in that office while the documents were been unloaded,

16  including Mr. Cason.  And that he could not say with certainty

17  that only Mr. Cason would have access to those documents inside

18  the City Hall.  Clearly, other people had an opportunity to

19  have access to those operator logs during the time that

20  Mr. Fields was in and out of the building, unloading the car,

21  his car rather, and delivering those documents into the

22  Administration Building.

23       Therefore, the Court believes that there is no

24  evidence that Mr. Cason willfully obstructed or attempted to

25  obstruct or impede this investigation by hiding those

1    documents.  The fact is, he was present, but so were others.

2    The fact is that he did have the opportunity to do it, but so

3    were others.

4           Therefore, based on these findings, it is the Court's

5    conclusion that the adjustment for obstruction of justice, the

6    two-point enhancement under Sentencing Guideline 3C1.1 as set

7    forth on Item 30 or Paragraph 30 of the Presentence Report is

8    not appropriate in this case and therefore, the Court will

9    uphold the objection by the defendant and will order that that

10   adjustment be struck from the calculation of the sentencing

11   guidelines.

12          Mr. Theodocion, next.

13          MR. THEODOCION:  Yes, sir, Judge.  Judge, would it be

14   possible for us to take about a five-minute break at this

15   point?

16          THE COURT:  That will be fine.  I tell you what,

17   we'll start back at 10:35.

18          MR. THEODOCION:  Thank you, your Honor.

19                        (AFTER RECESS)

20          THE COURT:  Mr. Theodocion, if I'm correct, that now

21   leaves us with your final objection.  Is that correct?

22          MR. THEODOCION:  That is correct, your Honor.

23          THE COURT:  All right.  Go right ahead.

24          MR. THEODOCION:  And, Judge, I am going to call a

25   witness shortly.  And I would ask, and my understanding is that

1   the Government does not intend to call any witnesses, but I

2   would ask, out of an abundance of caution, if someone might

3   possibly be called, I would ask to invoke the Rule at this

4   point.

5           THE COURT:  That will be fine.

6           Any objection, Mr. Stewart?

7           MR. STEWART:  The only person I think, live person, I

8   think we have here is our case agent.  And typically a case

9   agent does not--

10          MR. THEODOCION:  That's fine, your Honor.

11          THE COURT:  Is that okay?

12          MR. THEODOCION:  Yes, sir.

13          MR. STEWART:  And by the way, we'll be offering our

14  testimony through the grand jury transcripts that

15  Mr. Theodocion and I have agreed upon and which are on your

16  bench, your Honor.

17          THE COURT:  Very well.  So there's no other witness

18  other than the case agent, correct, in the courtroom?

19          MR. STEWART:  As far as the government is concerned,

20  yes, your Honor.

21          THE COURT:  Okay.

22          MR. THEODOCION:  All right.  Judge, at this point,

23  and I don't recall my numbering system, but we're at my

24  objection that deals with the six-level increase and the

25  four-level increase.  And I'm looking at the Presentence

1    Report, Paragraph 16, where it's alleged that on or about

2    January 29th, 2004, he caused the discharge of a pollutant (raw

3    sewage and wastewater) from a point source, which was a hose

4    connected to a pump, which pumped into the tributary of the

5    Euchee Creek without a valid permit.  And it's kind of

6    semantics.  Without a valid permit or in violation of a permit.

7    But it kind of both means the same thing in this case.

8           Your Honor, I do think it's important to note at the

9    outset there is a distinction.  And if you look -- I mean, it's

10   obviously in the Clean Water Act but in the guidelines as well.

11   2Q1.2 deals with Hazardous or Toxic Substances.  And we're

12   operating under 2Q1.3, which is Other Environmental Pollutants.

13   The alleged pollutants we're dealing with are things that you

14   are allowed to discharge; ergo, the entire permit process, with

15   certain conditions and requirements, of course.

16          But the City of Harlem, your Honor, via State of

17   Georgia Permit 20389 is authorized to discharge under the

18   National Pollutant Discharge Elimination System into those

19   receiving waters.  So they have a permit to discharge.  But as

20   a condition of this permit, of course, there is a multitude of

21   requirements as to the monitoring of the effluent which leaves

22   the facility.  You know, the daily, and weekly and monthly test

23   work that has to be done.  The reports that have to be filed in

24   Atlanta.

25          And, frankly, to a layperson this is just incredibly

1   confusing and makes no sense, how they use terms such as the

2   arithmetic means for values.  And it's just very complicated.

3   That's just how it is.  I don't really understand it, but

4   you've got to test, and you've got to retest, and you've got to

5   document, and you've got to send that up.  So to have a permit,

6   basically, this is the State saying, you can't sue the City of

7   Harlem because under these conditions, they have a right.

8   We're going to give them a right to discharge pollutants into

9   the environment, which, of course, they would never do for

10   hazardous or toxic substances.

11        So I do think it's important to put this in context,

12   the type of substances we're dealing with.  Particularly when

13   you look at 2Q1.3 Subsection (b)(1), the (b)(1)(A) states that:

14        If the offense resulted in an ongoing, continuous, or

15   repetitive discharge, release or emission of a pollutant into

16   the environment, increase by six levels.

17        If you look at the Application Note Four, it

18   indicates that that subsection assumes the discharge or

19   emission into the environment resulting in actual enviromental

20   contamination.  And one thing that is not going to be present

21   here, your Honor, is any evidence whatsoever of any test work

22   done or any determination as to any contamination whatsoever.

23   And so I think that's important as we look at the six-level

24   increase on (b)(1).

25        The four-level increase is under Subsection (b)(4)

1   where it indicates:

2            If the offense involved a discharge without a permit

3   or in violation of a permit, increase four levels.

4            And before presenting testimony, Judge, I do think

5   the argument is to be made that in this particular case it

6   would be something of a double count, or maybe that's the

7   improper term, but just an incorrect count to hit him both

8   ways.  Because, you know, if I go out and discharge these

9   pollutants in the environment, they're going to get me with a

10  six-level increase.  I'm not allowed to.  This plant can

11  discharge those pollutants.  It just has to do it according to

12  its permit.  It can't discharge without doing the test work,

13  without running it through the machine, without doing all the

14  processes that are required by the permit and that are required

15  under State and Federal law.  And so they have a right to

16  discharge as long as it's done in accordance with the terms and

17  conditions of its permit.

18           And so this particular discharge, that as director of

19  the plant was authorized, would more appropriately be deemed a

20  discharge in violation of the permit as opposed to a situation

21  where you would say, well, you don't have a right to discharge

22  at all.

23           In any event, Judge, I do want to call our first

24  witness, that being said, Mr. Todd Baldwin.  And while

25  Mr. Baldwin is coming up, Judge, you can see we've turned on

1    the monitors.  We're fortunate in this case that the

2    January 29th incident was videotaped.  And so we actually have

3    the actual occurrence which forms the basis of those ten

4    combined levels.

5    DEFENSE WITNESS, TODD BALDWIN, SWORN.

6              THE CLERK:  Please state your name for the record.

7              THE WITNESS:  Todd Baldwin.

8              THE CLERK:  And what is your position?

9              THE WITNESS:  I'm project manager with ESG

10   Operations.

11             THE CLERK:  Would you spell your last name.

12             THE WITNESS:  B-a-l-d-w-i-n.

13             THE CLERK:  Thank you.

14                          DIRECT EXAMINATION

15   BY MR. THEODOCION:

16        Q    Mr. Baldwin, how are you currently employed?

17        A    Excuse me?

18        Q    How are you currently employed?

19        A    I work with ESG Operations.  I am a project manager.

20   We go around, contract our services to operate, maintain water,

21   wastewater, public works facilities.

22        Q    And where are you located at this time?

23        A    I am in Florida.

24        Q    What sort of training and certificates do you have in

25   water, wastewater treatment and management?

1      A    I have a Class I water certificate, a Class II

2   wastewater certificate.  Both of those are in Georgia.  And I

3   have a Class B Florida wastewater certificate.

4      Q    And for how many years now have you worked in this

5   field?

6      A    Since 1993.

7      Q    And during that time, were you ever employed at the

8   Harlem Wastewater Treatment Plant?

9      A    Yes, sir.

10      Q    When was that?

11      A    I believe I started 2002, left in 2004.  Somewhere in

12   that area.  I remember leaving in July of 2004.

13      Q    Okay.  And so you were continuously employed during

14   that time?

15      A    Yes, sir.

16      Q    And so you were employed on or about January 29th,

17   2004?

18      A    Yes, sir.

19      Q    Just briefly, can you describe what that plant does,

20   how it operates, what it takes in and what it puts out.

21      A    It receives domestic wastewater, and that's basically

22   any wastewater from any household facility.  It's an SBR system

23   which is a sequencing batch reactor.  They work in sequence,

24   hence the name, sequencing.  They receive the flow.  All the

25   treatment process happens in one container.  And once that is

1  done, all your solids are pretty much settled to the bottom.

2  Your clean water is decanted off the top, run through a series

3  of chlorine sulfur dioxide, kill bacteria, kill chlorine before

4  it's discharged into the system.

5      Q    Okay.  And while the water is, sort of, out there and

6  waiting to be treated, you keep it moving, don't you?

7      A    Yes, sir.  I mean, while it's in the reactors

8  themselves, they're continuously being aerated, mixed, settled.

9  It goes through a process.  Like I said, one receives.  The

10  other one is doing its treatment.  When this one starts

11  receiving, the other one starts doing its treatment.

12      Q    On January 29th, 2004, what was the status of the

13  treatment plant?  Was it operating to full capacity?

14      A    As far as my knowledge, yes, sir.  I mean, we were

15  receiving wastewater in.  It was going directly to the SBRs.

16      Q    I'm referring specifically to the time period in

17  which you had the basin that was being worked on by Mr. Vaughn.

18      A    Oh, the actual pond was not in operation, no, sir.

19      Q    What is the pond?

20      A    The pond is more for a pretreatment process.  It is

21  to get rid of any non-biologicals that cannot be broke down in

22  the SBRs.  Woods, tennis shoes.  Anything that comes through

23  the sewer system that cannot be broken down.  It is actually

24  put there in that pond.

25      Q    Okay.  And you just keep the water moving, allow

1    those things to settle down?

2        A    Yes, sir.  You can keep it in that pond for as short

3    of time as two hours to two months.  Depending on how much you

4    want to settle out and how much you want to bring back to the

5    plant.

6        Q    Okay.  And on January 29th of 2004, what was the

7    status of that pond?

8        A    It was nonoperational.  It was not receiving sewage

9    whatsoever.

10       Q    Okay.  Do you recall for how long that had been the

11   case?

12       A    No, sir.  It was like that when I started, and I know

13   it had been like that prior to my employment.

14       Q    And you indicated you started in 2003.  Did you give

15   a month or approximate month?

16       A    I remember starting close to Memorial Day.  But like

17   I said, I can't remember if I was there a year or two years.

18       Q    Conservatively, by June of 2003, you were employed?

19       A    Yes, sir.

20       Q    Okay.  And during that time, during the seven months

21   until the 29th, that pond had not been used; is that correct?

22       A    Yeah.  The pond had not received any sewage

23   whatsoever.

24       Q    What type of work was being done to that pond?

25       A    When I became employed by the City of Harlem, a

1  contractor was on site trying to remove the sludge, remove all

2  the dirt.  There was a dirt dam that had been put in the middle

3  of the bond.  Their job was to move that and get the pond ready

4  for a clay liner to be installed.

5      Q    Okay.  And what is the purpose of the clay liner?

6      A    To keep any of the sewage from reaching into the

7  ground, the soils.

8      Q    And was that, the contractor, was that Ridge

9  Environmental?

10     A    Yes, sir.  I believe that was the name.  Yes, sir.

11     Q    How was work going moving towards January of 2004?

12 Were there problems out there at the site?

13     A    I know initially when I first started, the first

14 month, maybe two months, they spent more time working on the

15 equipment than they did the pond.  I do remember that.  They

16 had a lot of problems with their equipment.  Once they got

17 going, they started working.  I don't think any of us really

18 understood what his concept was.  But he had -- he actually was

19 out there working on and off, bringing in woodchips, mixing

20 stuff in.  Trying to, I assume, get the sludge into a more

21 solidified base to pull it out of the pond.

22     Q    Was he having trouble keeping the pond dry?

23     A    Yes, we were.

24     Q    And what was causing that?

25     A    Once he got certain areas -- at first, it was a

1   pre-conclusion that we were receiving a lot of ground water,

2   seeping up through the pond, running off the hill.  Rainwater.

3   We had a lot of significant rain events.  Once he got one area

4   of the pond clean, we could actually see where the liner was

5   not existent.  Water was filtering in from around the edges of

6   the pond from, we assumed, underground springs.

7        Q    So underneath the pond, you had water coming up

8   through the ground?

9        A    Yes, sir.  It was coming up in several places around

10  there.

11       Q    And what was done to try to alleviate that problem?

12       A    At that point in time, Ridge Environmental discussed

13  and got with the City and we put in a french drain system

14  around the pond.

15       Q    Okay.  And that took water from the pond to where?

16       A    Yes, sir.  It was in hopes of, putting the french

17  drain where they did, it would alleviate any more water from

18  entering the pond than what could be.  And it did alleviate

19  some.  I mean, it alleviated a good bit.

20       Q    And it took water that possibly would have come into

21  the pond and took it into that tributary--

22       A    Yes, sir.

23       Q    -- of the creek?  And that ran alongside the fence;

24  is that right?

25       A    Yes, sir.

1      Q     Okay.  You mentioned they were having rainwater.  Was

2   that a problem?

3      A     Yes, sir.  Any time it rained, it would build up in

4   the pond.  It would hold.  The pond was kind of sitting in a

5   hole area.  So any time it rained on the upper side of the

6   pond, it all ran into the pond.

7      Q     Okay.  And on or around the time of January 29th,

8   2004, were you ever having sewage back up into the pond?

9      A     I don't remember the exact dates.

10     Q     Do you ever recall that happening?  Do you ever

11  recall sewage backing up into that pond?

12     A     I saw sewage back up -- I don't want to say back up.

13  But I actually saw sewage at the headworks structure, or,

14  excuse me, the effluent structure of that pond on three

15  different occasions.  Initially, when I first started the work

16  all the sewage was there that had been there from the beginning

17  that they were trying to pump out.

18     Q     And this is in the summer of '03 that you're talking

19  about?

20     A     Yes, sir.  And then the second time was they were

21  trying to determine if there was a blockage in that line that

22  sent the pond -- how it was designed to send the water from the

23  pond to the SBRs.  And we brought in a jetter machine and

24  jetted water through there trying to alleviate a blockage.

25  When we did that, it was hard to tell if that was actually

1  sewage coming back down the line or actually the jet water we

2  were using cleaning out the line.

3       Q    And there was a third time?

4       A    The third time was a secondary contractor who came in

5  to replace the liner.  While they were removing clay around in

6  the pond, they actually hit one of the lower valves on that

7  structure.  When they did, a small amount of sewage actually

8  spilt out of that structure.  Best guess, probably a 10-foot

9  diameter area.  And that was all that came out of it.

10      Q    Those three different occasions, were those the only

11  times that you're aware that sewage came into the pond?

12      A    That's the only times I remember it being an issue or

13  I remember seeing it myself.  Yes, sir.

14      Q    You worked out there every day; did you not?

15      A    From about October of '03 until the time I left.

16      Q    From October '03 until July of '04, you were out

17  there pretty much every day Monday through Friday?

18      A    Yes, sir.

19      Q    And those three occasions, what was the most amount

20  of sewage that found its way into the pond?

21      A    As far as I knew, none.  I mean, as far as my best

22  knowledge.

23      Q    Not other than those three, I'm sorry.  But those

24  three times?

25      A    Those three times?

1    Q    Yes.  What's the most amount of sewage that you came

2  into that what you call more of a basin at this point than a

3  pond, right?

4    A    I mean, it wasn't enough to fill the pond up or to

5  even put enough on the bottom to cover the complete bottom of

6  the pond.

7    Q    Okay.  We're going to show a video, Mr. Baldwin.  If

8  you could tell the judge.  This is, in fact, the Harlem

9  Wastewater Treatment Plant; is it not?  The facility?

10    A    Right here on this monitor?

11    Q    Can you see that?

12    A    Yes, sir.  Yes, sir.  That looks about like the -- to

13  the top, left corner looks like the effluent structure of the

14  pond.

15    Q    Okay.  And looking out to the right, what looks like

16  that big hole, is that the basin that was the--

17    A    Yes, sir.

18    Q    Once it would be repaired would be the pond?

19    A    Yes, sir.

20          (Video plays while questions are asked)

21    Q    What are those posts that are in the ground there?

22    A    Those are actually posts that are supposed to hold

23  the aerators in place.  Aerators are supposed to be set in the

24  pond to keep your DO levels in the pond.

25    Q    Those little small patches of wetlands you see; is

1    that rainwater?

2         A    At that time I would assume, yes, sir, it was

3    rainwater.  Yes, sir.

4         Q    There were, in fact, two pumps at different points

5    and times that were placed in that basin, correct?

6         A    Yes, sir.  When I -- initially, during the

7    construction of our -- the phase that Ridge Environmental was

8    involved in, they actually had a deasil pump in the pond

9    itself, and they were dewatering.

10        Q    Okay.  Now, we're starting to see on the right part

11   of the screen here, there's a pump in the basin.  Is that the

12   electric pump?  You can see the blue pipe going up the hill?

13        A    Yes, sir.  That looks like an electric pump.  Yes,

14   sir.

15        Q    And the water there that is being pumped.  What was

16   the cause of that water?

17        A    At the time of that pump being in there, the majority

18   of water that was in there, if I remember, was rainwater and

19   groundwater.  We didn't see anything back up through the pond

20   itself.

21        Q    Did you consider that water to be a pollutant or

22   contaminated at all?

23        A    At that time, no, sir.

24             THE COURT:  May I ask a question.

25             MR. THEODOCION:  Yes, sir.

1                    (Video paused)

2          THE COURT:  Why would you not consider that water a

3    contaminant at the time?

4          THE WITNESS:  At the time, we were under the

5    assumption that it was nothing but rainwater and groundwater

6    that seeped up through the pond.  We had not seen any sewage

7    received in the pond.  The actual inlet for the pond was no

8    longer in use.  And at the time, I don't remember seeing the

9    voluminous amounts of wastewater come through from the effluent

10   structure that people had kept saying was coming through.

11         THE COURT:  Wouldn't there just be, by virtue of the

12   fact that that was an existing pond, just some residual

13   contamination in the soil that would be picked up in the water?

14         THE WITNESS:  That could be said, yes, sir.

15         THE COURT:  Okay.  So it could have happened?

16         THE WITNESS:  As in, where the water came from?

17         THE COURT:  I'm just saying, you've got an existing

18   pond where it previously had sewage in?

19         THE WITNESS:  Yes, sir.

20         THE COURT:  The fact that it was dry, the fact that

21   the rainwater was on top of it, is there some residual

22   contaminant lying around in the soil from previous--

23         THE WITNESS:  That is possible, yes, sir.

24         THE COURT:  -- activity?

25         THE WITNESS:  That is possible.

1          THE COURT:  So that could have been in that water.

2    I'm just asking.  There could have been some contaminant in

3    that water from the residual that might have been lying around

4    in the basin of that pond?

5          THE WITNESS:  I could say yes that could be true.

6    But without testing it -- I'm not a soil analyst.  So I

7    wouldn't feel safe to say yes or no on that question.

8          THE COURT:  I understand.  Thank you.

9               (Video resumed)

10   BY MR. THEODOCION:

11       Q    Mr. Baldwin, the water that is coming out of that

12   pump; do you see that there?

13       A    Yes, sir.

14       Q    You've seen a lot of raw sewage in your day, haven't

15   you?

16       A    Yes, sir.

17       Q    That appear to be raw sewage to you?

18       A    No, sir.

19       Q    I mean, does that look more like groundwater or

20   rainwater?

21       A    It's a lot clearer than most raw sewage I've seen.

22       Q    Yes, sir.  And that water is flowing, it must be just

23   a slight hill down towards that fence, right, once it leaves

24   the pipe?

25       A    Yes, sir.  I believe where the water actually came

1   out of the fence is pretty close to where the french drain

2   system was put in.

3        Q    Okay.  That deterioration that we see on or about the

4   middle of the screen there, was that caused by that electric

5   pump pumping water or did something else cause that?

6        A    I can't remember if the pump had caused that or if

7   that was actually where it just started caving in from where

8   the french drain was put in.  Because I remember in the area

9   where that pump was running out of was real close to where the

10  trench made for the outlet of the french drain went up under

11  the fence.  And I know during that time, when they got done, we

12  were having a lot of problems with erosion in that area.  We

13  were actually getting hay bales to put down and try and avoid

14  any more being washed away than what had been washed away.

15       Q    Okay.  I believe on this video you may be able to

16  point out to where the french drain is flowing water.  Is that

17  down below that there?

18       A    I remember the french drain was pretty deep in that

19  area.  I mean it was eight foot plus in that area if I remember

20  correctly.

21                      (Video played until end)

22  BY MR. THEODOCION:

23       Q    So Mr. Baldwin, you were at the plant after that day

24  you just saw on the tape, January 29th, 2004, you were there

25  for approximately another five and a half, six months, right?

1  Until July?

2       A    To the 1st of July.

3       Q    Okay.  And was there any test work done whatsoever on

4  that water that had built up in the pond in that spot?

5       A    No, sir, not to my knowledge there wasn't.

6       Q    Was there ever any test work done on the water that

7  was coming through the french drain or down below there to see

8  if there was any contamination whatsoever?

9       A    No, sir, not to my knowledge.  Not any biological

10  testing, no, sir.  I know we did flow testing on the french

11  drain to kind of determine how much was coming through.

12      Q    And the times that, the limited times where either

13  sewage or wastewater came into that pond, did it ever make it

14  over to that area where we saw the electric pump?

15      A    I never saw it.  In the initial phase, it was all in

16  the pond.  But once they got to the point that they had cleaned

17  out all the woodchips and were getting ready to remove the

18  liner, I don't ever remember seeing sewage get to that end of

19  the pond.  Most of it, if any came out, it conglomerated around

20  the effluent structure.

21           MR. THEODOCION:  That's all I have, Judge.

22           THE COURT:  Thank you.

23           Mr. Stewart.

24           MR. STEWART:  Thank you, your Honor.

25                          CROSS-EXAMINATION

1    BY MR. STEWART:

2        Q    Good morning, Mr. Baldwin.  My name is David Stewart.

3    We've met before, haven't we?

4        A    Yes, sir.

5        Q    Do you recall where that was?

6        A    Grand jury in Savannah.

7        Q    That's the only time we've ever talked before,

8    correct?

9        A    As far as I know, yes, sir.

10       Q    And there was a court reporter there taking down your

11   testimony; do you recall that?

12       A    Yes, sir.

13       Q    Did you know the folks that worked at the plant

14   before you got there, Mr. Carroll or a Pittman?

15       A    I knew of Mr. Carroll and knew somewhat before.

16   Excuse me.  He ended up being my neighbor either while I was

17   working for Harlem or after I had left Harlem.

18       Q    But you knew that he worked at the plant before you

19   worked there?

20       A    Yes, sir.

21       Q    All right.  And then while you were working there,

22   did you know a Mr. Sylvester Bush?

23       A    Yes, sir.

24       Q    Who was Mr. Bush?

25       A    We actually brought him in to train him at the

1   wastewater plant.

2        Q     How about a Wayne Davis?

3        A     Yes, sir.

4        Q     He worked there while you were there?

5        A     He was actually there prior to me getting there.

6        Q     A Mr. Paine?

7        A     He was also employed there prior to my arrival.

8        Q     But you're aware of all of these individuals?

9        A     Yes, sir.

10       Q     That they worked there and worked around this pond

11   that we were just looking at today?

12       A     Yes, sir.

13       Q     Okay.  Now, you just testified today that the pond

14   was supposed to be offline?

15       A     Yes, sir.  It was not supposed to receive any sewage.

16   Yes, sir.

17       Q     But it did get sewage on certain occasions?

18       A     Yes, sir.  Like I said, the three times that I

19   recollected it came out of the effluent structure.

20       Q     You have three specific recollections of sewage

21   getting into that pond which was supposed to be offline?

22       A     Yes, sir.

23       Q     And you were saying that was at the top end of the

24   pond that you saw the sewage, correct?

25       A     Yes, sir.

1     Q    And then you were saying that, you know, there was

2   some rain like we always have in Georgia during this time

3   period that we're talking about, right?

4     A    Yes, sir.

5     Q    And the rain would fall, you were testifying how the

6   rain would fall at the top and kind of wash down through the

7   pond because the gradation of the pond?

8     A    I was saying it would, on the opposite side of the

9   effluent structure, the land is actually taller.  And it slopes

10   off toward the plant, towards the swamp in there.  And that's

11   usually where the run to.

12     Q    Water goes downhill, right?

13     A    Yes, sir.

14     Q    Okay.  We agree about that.  And the sewage that you

15   saw on those occasions was at a higher elevation.  When the

16   rainwater comes down, and rain goes downhill to the bottom part

17   of the pool?

18     A    If it is higher or lower, I would say yeah.  Water is

19   going to flow downhill, yes, sir.

20     Q    And then you saw a pump in the pond at the bottom end

21   of the pond, right?

22     A    Yes, sir.

23     Q    And that pump then pumped it out, was pumping out

24   liquid.  And you don't know what was in that liquid, correct?

25     A    As far as testing, no.

1      Q    Okay.

2      A    We remember the pond being somewhat dry, and then

3   having rain events.  And every time we do, water comes out of

4   the ground everywhere up there.

5      Q    And if I may direct your attention back to the video.

6           MR. STEWART:  And, Mr. Howell, may I turn on the

7   audio system?  Well, I'll just take this microphone right here.

8   This works.

9                   (Segment of video replayed and paused)

10  BY MR. STEWART:

11     Q    That structure that we just saw, is that the influent

12  structure?

13     A    That's the effluent.  That's where the pond actually

14  drains out of into the SBRs.

15     Q    Into the SBRs.

16     A    Yes, sir.

17     Q    And so that's where sewage, when the pond is online,

18  that's where the sewage comes into the pond?

19     A    That's where -- no, sir.  That's not where it comes

20  into the pond.  That's where it leaves the pond.

21     Q    That's where it leaves the pond.  Where does the

22  sewage come into the pond?

23     A    The opposite side of the pond.  It's actually in the

24  video.  You'll see it.  There's a pipe that comes into the pond

25  about halfway.  I would say in the middle of the pond, on the

1   edge of the middle, I guess you could say.

2        Q    And that's where, as you testified today, you saw

3   sewage come out of that on--

4        A    No, I've never seen sewage come out of that pipe.

5   That pipe was offline.

6        Q    Okay.  But you did see sewage come into the pond

7   through the--

8        A    The effluent structure.

9        Q    -- this structure that we just saw?

10       A    Yes, sir.

11       Q    Okay.

12                 (Segment of video replayed and paused)

13  BY MR. STEWART:

14       Q    All right.  In that footage there, do you see a large

15  pump?

16       A    Yes, sir.

17       Q    And what pump was that?

18       A    That was a pump they had used in the beginning while

19  they were getting the woodchips out.  Any time water would come

20  into the pond, they would turn that pump on.

21       Q    When you say "they," are you talking about the

22  contractors?

23       A    Yes, sir, Ridge Environmental.  Whoever was there at

24  the time.

25       Q    Where were they pumping that?  Where was that pump

1    directing the liquid to?

2        A    I want to say it was a pump directly to the

3    headworks, to the beginning of the plant.

4        Q    And explain how this plant works because you were

5    talking -- is the headworks where the sewage comes into the

6    plant?

7        A    Yes, sir.  That's the actual beginning of the

8    treatment facility.

9        Q    So when sewage comes in from the City, it comes in

10   through the headworks, then it's treated, and then it goes out

11   treated, cleaned up, it goes out.  What do you call it where it

12   goes out?

13       A    Our outfall.

14       Q    Outfall.  So is it fair to say that the stuff coming

15   into the plant is called influent?

16       A    Yes, sir.  It's influent and effluent.

17       Q    And effluent is what goes out?

18       A    Yes, sir.

19       Q    So we have our terminology straight.  So the

20   contractors were pumping the water that was in that pond to the

21   headworks, and then that water was getting treated through the

22   plant?

23       A    Yeah, initially, yes, sir.

24       Q    And why would they -- why would they pump that water

25   to the headworks?

1      A    My assumption was, the amount of water that was in

2   the pond when they started, they were making sure it was not

3   raw sewage in the pond.

4      Q    Because you need to treat that kind of stuff?

5      A    Yes, sir.

6      Q    And it goes up to the headworks.

7      A    Yes, sir.

8                  (Segment of video replayed and paused)

9   BY MR. STEWART:

10     Q    And that building right there, is that where y'all

11  work?  Is that the--

12     A    Yes, that building is the main office.  That's the

13  lab and office.

14     Q    Okay.  You see that water down there in that pond?

15     A    Yes, sir.

16     Q    You don't know what that water is?

17     A    At this time, no.  I mean, we assumed it was

18  groundwater or rainwater.

19     Q    Your assumption?

20     A    Yes, sir.

21     Q    Because it rains in Georgia and there's groundwater

22  in this area.

23     A    Yes, sir.

24     Q    Can you tell what it is looking at the color of it?

25     A    No, sir.

1    Q    But when you see it coming out of the pipe, you

2    testified that it looked pretty clean to you?

3    A    Yes, sir, it did.

4    Q    Are you familiar with the concept of aeration?

5    A    Yes, sir.

6    Q    For regular folks, if I took a garden hose and, you

7    know, stuck my thumb on it, and turned the water on, and it

8    sprays out, that water is being aerated?

9    A    Yes, sir.

10   Q    And it looks pretty clean because air is being added

11   into it?

12   A    Yes, sir.

13   Q    That's different than standing water?

14   A    You're correct.  Yes, sir.

15   Q    And something that looks one color when it's

16   standing, when you spray it out of a hose or you aerate it, it

17   can look a different color?

18   A    Yes, sir.

19   Q    And just by looking at the color of something, you

20   can't tell whether it's clean or unclean water, correct?

21   A    No, sir.  You're correct.

22   Q    I mean, there's a lot of clear things that you

23   wouldn't want to drink because it could be harmful to you?

24   A    That is correct.

25        MR. STEWART:  One moment.

1  BY MR. STEWART:

2      Q    All right.  Just continuing on, real quick.

3                   (Segment of video replayed and paused)

4  BY MR. STEWART:

5      Q    Do you recognize the voice on this?  Can you hear it

6  up there?

7      A    No, sir.  I can't hear it well enough to--

8      Q    Okay.  I apologize for that.

9                   (Segment of video replayed and paused)

10  BY MR. STEWART:

11      Q    Had you seen that pump in that pond before this day?

12      A    It was in there for a few days.

13      Q    And it pumped on more occasions than this occasion,

14  correct?

15      A    Yes, sir.  I can't remember if it was two or three

16  days.  But it was there for a few days.

17      Q    So multiple pumping occurring with this pump?

18      A    Now, whether or not it pumped all those days, I could

19  not tell you.  But I do know it was there.

20      Q    Who was responsible for handing this pump of the

21  folks you were talking about working there at the plant?

22      A    If I remember correctly, during this time we were

23  doing a lot of running around, cleaning up.  If I remember

24  correctly, it was Sylvester Bush was involved in either, I

25  believe, it was electric pumps that had to be plugged in.  If I

1   remember correctly, he was the one who was supposed to be

2   plugging in or unplugging it.  Make sure that it didn't run all

3   night or all day.

4        Q    Who directs Sylvester Bush?  Who was his boss?

5        A    Mr. Cason was.

6                   (Segment of video replayed and paused)

7   BY MR. STEWART:

8        Q    Drawing your attention to the middle of the screen,

9   do you see a french drain down there?  Do you see a black

10  object?

11       A    I see a black object in the middle of some orange.

12       Q    All right.  I'm going to play it a little bit more to

13  see if we can get a better look at that.

14                  (Segment of video continued and paused)

15  BY MR. STEWART:

16       Q    Does that look like a part of the french drain you

17  were talking about?

18       A    I can't see anything or else I don't see anything on

19  the TV screen.

20       Q    Okay.  Well, not on this screen shot, but previously

21  when we played it.

22       A    Oh, the black object?  It could have been a piece of

23  it, yes, sir.

24       Q    Okay.  You were talking about erosion and such.  Was

25  soil and rock and sediment getting washed down?  Is that what

1    you were talking about?

2        A    Yes, sir.  When they got done with the french drain,

3    I remember we had to do a lot of facial, aesthetic things, such

4    as, put hay in, put silt fence up.  During rain events, it was

5    washing away the side of the hill where the drain system had

6    been in.

7        Q    So rain was washing that stuff away.  How about a

8    hose?  Was that washing stuff down too?

9        A    It's very possible, yes, sir.

10       Q    And why would you put out hay and silt fences and

11   such?  Why go through the effort?

12       A    One, you want to keep your soil where it's at, in

13   place.  Two, you don't want it leaving your site.

14       Q    Because if it left this site, where was it going?

15       A    On somebody else's property.

16       Q    What is down there in the wooded area?

17       A    If I remember correctly, it's just a swamp.  Just a

18   wet, boggy area.

19       Q    The plant discharges the effluent, so the treated

20   stuff, in that area and it goes downstream, correct?

21       A    Yes, sir.  Further down, closer to where it actually

22   forms a creek is where we discharge into.

23       Q    But like we were talking about at the beginning, you

24   know, water goes downhill.

25       A    Yes, sir.

1     Q     So what we were just watching wasn't being pumped to

2     the headworks?

3     A     No, sir.

4     Q     Like the other pump had been pumping to the

5     headworks?

6     A     Yes, sir.

7     Q     And this pump was being run under Mr. Cason's

8     direction by Sylvester Bush?

9     A     As far as I know, yes, sir.

10    Q     Not only on this one day?

11    A     That's possible.  Yes, sir.

12    Q     It was out there for a while?

13    A     Yes, sir.

14    Q     You were talking about not wanting the sewage to

15    reach down into the soil when you were talking about the liner,

16    correct?

17    A     Yes, sir.

18    Q     And you're saying there wasn't a liner at this time?

19    A     There were several places that, when they started

20    doing the construction trying to remove what they thought was a

21    liner, there was several places where there was no liner

22    whatsoever.

23    Q     And so sewage had been reaching into that soil?

24    A     Yes, sir.

25    Q     That soil that's there where that water was that's

1   getting pumped out?

2       A     In that area, yes, sir.

3       Q     Why did you leave the wastewater treatment plant?

4       A     It was time for me to move on.  I just didn't agree.

5   When you start butting heads with people, it's time for you to

6   move on.

7       Q     Who were you butting heads with?

8       A     Myself and Mr. Cason.  Even though he was a good

9   person to try to work for, he was real tough.  He was real

10  detailed-oriented.  And if you didn't follow something to his

11  detail, he got mad at you.  And I just, I thought -- like, I

12  had a opportunity that was presented to me, and it was better

13  for me to leave.

14      Q     So if you didn't do the things that he told you to

15  do, he would get mad at you?

16      A     Yes, sir.  That's what most bosses do.

17            MR. STEWART:  I have no further questions, your

18  Honor.

19            THE COURT:  Thank you.

20                     QUESTIONS BY THE COURT

21  BY THE COURT:

22      Q     Mr. Baldwin.

23      A     Yes, sir.

24      Q     How many other wastewater treatment facilities have

25  you worked at or had access to as a contractor?  I mean, just

1   an estimate is fine.

2        A    Probably seven to ten.

3        Q    Have you ever seen, at any of those other plants,

4   water being pumped out directly into a stream or a tributary or

5   a swamp or a wetlands area?

6        A    No, sir.

7        Q    This would be the only occurrence that you've ever

8   seen of that?

9        A    Yes, sir.  As far as I can remember, yes, sir.

10       Q    Did you find it unusual when you saw that pump

11  pumping that water out directly?

12       A    At that particular time, no, sir.

13       Q    You didn't find that unusual?

14       A    At that time, again, I think we were all -- and I

15  know ignorance is not a plea.  But I think at the time all of

16  us were under the assumption that it was ground water.  As I

17  further, you know, working where I've worked, and some of the

18  education that I've gotten, it's better now to -- if it hits

19  the ground, I test it.

20            THE COURT:  Okay.  Any other questions, Mr. Stewart?

21            MR. STEWART:  To follow up on that.

22                 CROSS-EXAMINATION CONTINUED

23  BY MR. STEWART:

24       Q    Did anybody ever come out and talk to you about this

25  pumping?  Anybody and I'm talking from the state or--

1      A      Yes, sir, one time they did.

2      Q      And did you tell them about this pumping?

3      A      No, sir.

4      Q      But you didn't think it was wrong that the pumping

5   was occurring?

6      A      At the time when he showed up, usually, he comes to

7   talk to Mr. Cason.  Very rarely does he talk to us.  If he's

8   talking to us, we're usually talking about fishing.  Usually

9   when it comes to plant operations, he usually talks to Mr.

10   Cason.  If Mr. Cason was not available, he'd question us.  And

11   at the time, self-preservation, less said is what you do.  You

12   don't -- you let them talk to the bosses.

13      Q      Speaking a little bit about self-preservation, if you

14   didn't think it was wrong about what was going on, what harm

15   would there have been to mention it to him when he was talking

16   to you about it?

17      A      Again, regardless of whether you think it's wrong or

18   not, I've learned coming up from '93 to several different

19   counties and cities, when the EPD, EPA shows up, they talk to

20   the boss.  They do not talk to you unless your boss directs you

21   to talk to them.

22      Q      Because, you know, Mr. Cason, he's in charge there,

23   right?

24      A      He was my boss.  Yes, sir.

25      Q      And he wants you to follow his directions on how the

1    place is run?

2        A    Well, it's just, you don't -- like I said, it's a

3    standing rule.  I don't know how to explain it.  I mean we

4    don't--

5        Q    That's fine.

6             THE COURT:  Mr. Theodocion.

7             MR. THEODOCION:  Your Honor, thank you.

8             THE COURT:  Go ahead.

9                         REDIRECT EXAMINATION

10   BY MR. THEODOCION:

11       Q    Mr. Baldwin, you were out there doing the different

12   water tests that you were to do.  You did the best you could,

13   right?

14       A    Yes, sir.

15       Q    And Mr. Cason never instructed you to fudge any

16   numbers, did he?

17       A    No, sir.

18       Q    And you wouldn't have, would you?

19       A    No, sir.

20       Q    You've indicated at the time -- obviously, it's not

21   the best practice to pump anything other than through the

22   headworks.  You're better being safe than sorry, right?  We

23   realize that now.  But at the time you testified that really

24   y'all were under the impression that, hey, this is rainwater.

25   It's groundwater.  At the time, based on your training then,

1    were you of the opinion that if it had any sort of fecal matter

2    in it, it would have been more akin to the degree of fecal and

3    bacteria that you find in pretty much any piece of water that

4    has fish in it, frogs, birds, that it would have that type of

5    material?

6         A    At the time that was our belief.  I mean, we didn't

7    see nothing wrong with what we were doing.

8         Q    Okay.  Because the real thing about a wastewater

9    treatment plant is not that you're going to have matter in

10   water, but you have to be below a certain level, right?

11        A    Correct.  You're going to have biologicals as a

12   matter in it.  But you have certain levels that you cannot go

13   above.

14        Q    So the error was assuming that that water was below a

15   certain level instead of the safer route that was to ensure

16   that, correct?

17        A    Yes, sir, I guess you could say so.

18             MR. THEODOCION:  That's all I have of this witness,

19   your Honor.

20             THE COURT:  Anything else, Mr. Stewart?

21             MR. STEWART:  Just one followup.

22                         RECROSS-EXAMINATION

23   BY MR. STEWART:

24        Q    They were no fish in this pond?

25        A    No, sir, we did not.

1      Q      This was a pond for sewage, right?  Not for fishing?

2      A      That's correct, sir.

3             THE COURT:  Any reason why this witness can't be

4      excused?

5             MR. THEODOCION:  There's not, your Honor.

6             THE COURT:  You're excused.  Thank you, Mr. Baldwin.

7             MR. THEODOCION:  And, Judge, I also want to point out

8      that Mr. Raymond Fulcher of G. Ben Turnipseed, which was an

9      inspector with that engineering firm, was interviewed on the

10     16th of October, 2008.  And per the EPA Investigative Activity

11     Report Form 008, Page Two, indicated that he inspected the work

12     that was being done at the holding pond, and that he thought it

13     was ground water and rainwater that was seeping into the upper

14     end of the pond and not sewage.

15            And, again, with regard to my example about fish, I'm

16     not alleging there were fish that were causing the bacteria.

17     But rather pointing out the fact that in any, basically, non

18     swimming pool at somebody's house, you're going to have fecal

19     matter.  And the mistake here seems to clearly have been, that

20     the people out there, they just assumed that the water was

21     fine.  This is just rainwater, groundwater.  We don't need to

22     treat it.  It's obviously not best practices, it's not in

23     accordance with the permit.

24            But when you look at the sentencing guideline that

25     affects here, in particular where it says it assumes actual

1    contamination, given that there is no -- and your Honor is not

2    going to hear any evidence of a documentation of any

3    contamination.  And I also note that in the Presentence Report

4    that Ms. Mitchell indicated that there were no identifiable

5    victims in case.  There will be no evidence of environmental

6    harm.  And so the issue is going to come down to, and your

7    Honor hit on it pretty early, that, you're right, if you have

8    water that sits on top of ground which has previously contained

9    sewage that that's the problem.  It's not going to be pristine

10   water.

11          But our argument against these enhancements are,

12   looking at the water -- and, I'm sorry, garden hoses just don't

13   put out raw sewage.  There is an oxidation phenomenon.  But it

14   doesn't turn water that clear that's raw sewage.  Based on what

15   Mr. Baldwin is saying, what Mr. Fulcher said, it's clear where

16   that water came from.  So the only issue is, not that raw

17   sewage is being pumped out, but what degree of environmental

18   pollutants were in that water.  And, again, there's going to be

19   no test work on the water itself.  No test work on the ground.

20   Certainly no indication of any effect on the Savannah River or

21   any of the land in between there and the Savannah River.

22          And our argument is going to be, Judge, that they

23   have not done the most important thing which is to show it was

24   a pollutant.  There has to be a showing, some showing, based on

25   some facts that this is a pollutant.  I mean, you can

1    speculate.  Not necessarily you, but anyone could speculate

2    that it's probably this or probably that.  But at some point,

3    they have to have at least one piece of evidence as far as what

4    was in that water before they can reach the preponderance of

5    evidence standard.  Which they're not going to be able to do.

6    There is not going to be a single piece of evidence regarding

7    what was in that water.  And so, on those grounds, we don't

8    think the six or the four is appropriate.

9         As I mentioned earlier, Judge, there were two things.

10   Number one, the six because of the fact that that can't show

11   it's a pollutant.  Also because of Application Note Four which

12   says it assumes actual environmental contamination.  So I think

13   the six level is not appropriate based on that.

14        If your Honor found that it was, later in that

15   headnote it says that:

16        Depending upon the harm resulting from the emission,

17   the quantity and nature of the pollutant, the duration of the

18   offense and the risk associated with the violation, a departure

19   of up to two levels in either direction from those prescribed

20   may be appropriate.

21        And so you can imagine the most obscene case where we

22   just have all kind of evidence of serious environmental

23   contamination, you'd be looking at eight levels as opposed to

24   this case which, I would suggest, wouldn't be appropriate for

25   the six.  But if it was, clearly would be in the range of two

1   down from that.

2            But I would also say, Judge, if your Honor finds

3   based on what Mr. Steward presents later that this was a

4   pollutant, you could properly classify this water as a

5   pollutant, I would still suggest that this is more akin to

6   discharging a pollutant in violation of the permit as opposed

7   to a discharge of the pollutant.  Again, particularly when you

8   read it in line with the assumption that there's contamination.

9            So I would suggest that if your Honor finds that this

10  was a pollutant that the four levels for operating in violation

11  of the permit would be the appropriate enhancement.  But of

12  course, we would ask that you don't impose any of them.  But I

13  know Mr. Stewart is going to present the case to the contrary.

14           THE COURT:  But are you arguing that pumping water

15  directly out of that pond into a tributary is at a minimum not

16  a violation of their EPD permit?

17           MR. THEODOCION:  It's hard to argue that it's not a

18  violation of the permit.  I think that the six-level

19  enhancement seems to require a showing of contamination.  But I

20  believe that your Honor is correct.  It would be a four

21  level -- it's clearly in violation of the permit to allow that

22  water to leave that pond, leave that basin, without being

23  treated.

24           THE COURT:  So you concede, then, that at a minimum

25  it is a violation of the permit?

1          MR. THEODOCION:  Well, I hate to use the word

2    concede, your Honor.  I can understand how you would think it

3    is.

4          THE COURT:  I understand.  I understand.  But you're

5    not arguing that clearly it's not a violation.  That's not your

6    argument.

7          MR. THEODOCION:  I'm not, Judge.  They have a permit

8    which governs their discharge of water into that tributary.

9    And this has to do with complied with.  Absolutely.

10         THE COURT:  Mr. Stewart, your response.

11         MR. STEWART:  Your Honor, the counsel's candor is

12   entirely appropriate.  And the permit is for it to go through

13   the system and go out the effluent, not out of a pipe.  So that

14   much is clear.  However, at the beginning of counsel's

15   argument, his very good argument, he talked about this double

16   counting, kind of double dipping.  His issue with the

17   guidelines, the two enhancements, the six and the four.

18         Yet, the Eleventh Circuit, in the *United States*

19   *versus Perez* case from 2004, that citation is 366 F.3d 1178,

20   they were presented with that very same argument.  And they

21   rejected it.  They said, the guidelines are set up, and these

22   are the guidelines we've all been following.  And it's not

23   impermissible double counting.  It's not double dipping; it's

24   just how the guidelines are set up.  And they approved giving

25   both of those enhancements at the same time.

1              Then they tackled the question that Mr. Theodocion

2      has aptly put to the Court.  And I'll just go ahead and read

3      Mr. Perez's argument and the Government's contention first

4      because that's the order it comes in in the opinion.

5              Under the Government's reading of the Commentary, for

6      the guidelines, the government must prove only that the

7      defendant's conduct fits the language of the guideline.  If the

8      defendant [sic] proves the defendant was responsible for the

9      discharge, release, or emission of a pollutant, it has met its

10     burden.  According to this interpretation, the guideline

11     assumes actual environmental contamination if the text of, as

12     we're dealing with, Section 2Q1.3(b)(1) is met.

13             However, Perez insists that an assumption of actual

14     environmental contamination is inappropriate since that section

15     pertains to dumped materials that are not hazardous or toxic.

16     Just like Mr. Theodocion was arguing.  Instead, Perez contends

17     that the Government had the burden to prove, by a preponderance

18     of the evidence, that the dumping caused actual environmental

19     contamination.  The exact same argument today.

20             The Eleventh Circuit went on to hold in the *United*

21     *States versus Perez* case that that is not the case.  Actual

22     environmental contamination does not need to be proved.  If it

23     meets the guideline's language then it is assumed by the

24     guidelines, and the enhancement is appropriate.  And it is not

25     double counting to give the six points for the pumping and the

1   four points for the permit violation.

2            I have this case.  I only printed one copy.  I can

3   give it to whoever you want, your Honor.  If you want to see it

4   or to the clerk.

5            THE COURT:  Please.

6            MR. STEWART:  Your Honor, this also came up in the

7   case of *United States of America versus Ortiz* out of the Tenth

8   Circuit.  That's a 2005 case, citation 427 F.3d, 1278, where

9   the Court did not apply these enhancements and was reversed.

10  And the Court said in that case they were dealing with the

11  ongoing, continuous or repetitive discharge.  They said two

12  pumping occasions, two discharges, qualifies for the ongoing,

13  continuous or repetitive discharge.

14           So, your Honor, the case law that interprets these

15  guidelines is clear that the enhancements recommended by the

16  probation office, one, can be given.  Two, the evidence in this

17  case supports that they be given because we're not just dealing

18  with just one pumping incident that was caught on video.  How

19  often do you catch pumping on video?  Yet it happened on this

20  one occasion.  But you have the testimony from Mr. Baldwin that

21  it happened on different occasions.  And, in fact, your Honor,

22  on your bench in front of you, you have the grand jury

23  transcripts from these other individuals, these employees that

24  worked at the plant.  You've got the testimony of Mr. Pittman

25  and Mr. Carroll who worked there before him.  Your Honor,

1   drawing your attention to Mr. Pittman and Mr. Carroll, they

2   indicate that this was not an isolated incident.  This was

3   ongoing, continuous and repetitive discharge.  And, in fact,

4   they testified as to actual environmental contamination.

5          Turning, your Honor, to Page--

6          MR. THEODOCION:  Judge, while he's looking for this,

7   I do want to point out, your Honor, that the indictment charged

8   on January 29 of pumping and then in the Presentence Report,

9   Ms. Mitchell indicated, as far as relative conduct, it was the

10  January 29th, 2004 pumping.  So I don't think it's appropriate

11  now to say, well, we're going to present evidence of relevant

12  conduct that wasn't included in the Presentence Report.  They

13  had an opportunity to object to this just like I did.  Just

14  like I can make an objection that there's too much relevant

15  conduct included, they're allowed to object that there's too

16  little.  And we're allowed to have notice of any relevant

17  conduct that will be proposed to be used against us at the

18  sentencing hearing.

19         And, again -- and we're not making an issue out of

20  the continuous discharge.  I mean, just watching the video.

21  We're not going to make an argument, well, they haven't proved

22  that it was continuous and repetitive.  Those are pretty vague

23  terms.  But we were going to suggest that it's not going to be

24  appropriate for them to say that this occurred on other dates

25  and times given the fact that they did not object to

94

1   Ms. Mitchell's assertions in the PSR.

2           MR. STEWART:  Your Honor, we did give notice, 404(b)

3   Notice, where we outlined all of these events.  And under the

4   Government's understanding of relevant conduct, and I've got to

5   find the Presentence Report in front of me, I'm not so sure

6   that it was such a bright line.  But it may or may not.  The

7   Presentence Report will speak for itself as to whether the

8   relevant conduct is only limited to this one occasion.  But to

9   contest the issue of, well -- and counsel says they're not

10  contesting the issue of whether is was continuous or not.

11          So as this evidence under 404b) would be used, this

12  shows that this wasn't just a mistake.  It wasn't, you know,

13  something that happened.  That this was going on for a long

14  time.  Your Honor has the grand jury transcripts in front of

15  him, if you'd like to review them.  They're the same

16  transcripts that have been provided to the defense counsel and

17  probation officer.  The transcripts we've all been working off

18  of.

19          So without going back through the Presentence Report

20  closely, I can't dispute Mr. Theodocion's statement that

21  there's no reference to any of this in there.  I believe that

22  there was in the addendum.  But I may be incorrect.  But the

23  Government would take the position that it's occurred many

24  different times.  The testimony, the sworn testimony from the

25  grand jury, is in front of you.  Not only from Mr. Pittman,

1    from Mr. Carroll, from Mr. Davis, from Mr. Baldwin talked

2    about, you know, he saw the pumping.  From Mr. Bush.

3            And getting back to Mr. Poole, because you haven't

4    heard a lot about Mr. Poole.  You have his grand jury testimony

5    in front of you.  Mr. Poole was the man who made this video,

6    your Honor.  That was his voice on there as it's described in

7    the grand jury transcript.  Mr. Poole knows that this water was

8    not pure rainwater that was coming out of there.  He knew

9    because he went down there where it was flowing down the hill

10   and smelled it.  So they didn't perform any testing.  But using

11   their sensory perception, sight and smell -- smell that we

12   can't get off of this video -- he testified to the grand jury

13   that it was sewage contaminated water that was being pumped on

14   this occasion on this video.  So that does go back to the

15   specific video that we're talking about today.

16           But it wasn't just this one time.  The sewage was

17   pumped on other times.  But if counsel is correct that that is

18   beyond the scope of the Presentence Report, then it is.  But

19   the transcripts are there for your Honor along with the index

20   that shows the different pages where they testified about

21   pumping on other occasions, and the discharge, as well as the

22   testimony about sewage being in that pond on various occasions.

23           THE COURT:  Thank you.

24           The issue now before the Court is the defendant's

25   objections to Paragraphs 10, 14, 16, 26 and 27.  Specifically,

1    the enhancement in Paragraph 26 under Sentencing Guideline

2    Section 2Q1.3(b)(1)(A) and the additional four-point

3    enhancement.  That was the six-point enhancement.  The

4    additional four-point enhancement under 2Q1.3(b)(4).

5            The defendant has denied that the electric pump in

6    question ever pumped raw sewage, but only pumped rainwater.

7    The Court notes that under Sentencing Guideline 2Q1.3(b)(1)(A),

8    the Court needs to find that the offense resulted in an

9    ongoing, continuous or repetitive discharge, release or

10   emission of a pollutant into the environment.  The Court also

11   notes that under Sentencing Guideline Section 2Q1.3(b)(4) in

12   order to find that this enhancement is applicable, the Court

13   must find that the offense involved a discharge without a

14   permit or in violation of a permit.

15           As to the six-point enhancement under 2Q1.3(b)(1)(A),

16   the Court has listened to the argument of counsel for the

17   defense and the argument of counsel for the Government.  The

18   Court has listened to the live testimony of Mr. Todd Baldwin of

19   the ESG Operations.  The Court has reviewed the very detailed

20   response provided by the probation officer to this objection,

21   particularly as it relates to the testimony by others involved

22   with the Harlem Wastewater Treatment Plant as to their

23   conclusions regarding the pumping of this water into the

24   tributary.

25           The Court notes that under *United States versus*

1    *Perez*, which is an Eleventh Circuit case, 366 Fed 3d 1178 from

2    2004, that actual contamination is not required for a discharge

3    enhancement under this particular provision.  The Court further

4    notes that while this water was not tested, it seems to the

5    Court clear that pumping water, whatever the source of that

6    water, from a wastewater treatment pond directly into a

7    tributary rather than back through the wastewater treatment

8    plant is akin to pumping untreated human sewage through that

9    pipe into the tributary.

10         The evidence in this case, in my opinion, clearly

11   shows that the water was being pumped out of a, while not used,

12   out of an existing wastewater treatment pond.  Therefore, the

13   Court is convinced that the water being pumped out of the pond

14   is a pollutant under the provisions of this particular

15   sentencing guideline.  Clearly, the video shows that it was an

16   ongoing process.  Therefore, the Court finds that the

17   application of the six-point enhancement under Subsection

18   (b)(1)(A) is appropriate, and the objection raised by the

19   defendant as to this particular enhancement is overruled.

20         As it relates to the enhancement under 2Q1.3(b)(4),

21   under Paragraph 27 of the Presentence Report for a discharge

22   without a permit or in violation of a permit, again, the Court

23   has considered the arguments of counsel, listened to the

24   testimony of Mr. Baldwin, and reviewed the very detailed

25   response by the probation officer to these objections which

1   contains a number of comments regarding the activities going on

2   at the plant.

3           And the Court finds that, by a preponderance of the

4   evidence, that the pumping of this water from this wastewater

5   treatment pond at the Harlem Wastewater Treatment Plant was

6   clearly either without a legal permit or was in violation of

7   the existing permit issued by the Georgia Environmental

8   Protection Division governing that particular plant.

9   Therefore, the Court finds that the four-point enhancement is

10  likewise appropriate in this case, and the defendant's

11  objections are overruled.

12          MR. THEODOCION:  Judge, if I may.

13          THE COURT:  You may.

14          MR. THEODOCION:  It wasn't included in a formal

15  objection, although we dispute it, we objected to the base

16  level.  Would your Honor consider the two-level adjustment to

17  that is addressed in Application Note Number Four, basically

18  which says that since this section can cover such a wide range

19  of potential occurrences that, you know, six is necessary.

20  It's really kind of a four through eight boost up.  And

21  considering what, certainly by Mr. Baldwin's account, seemed to

22  be a lack of *mens rea* here and given the broad spectrum of

23  possibilities of discharge of pollutants that you could

24  consider in terms of (b)(1)(A) either four or five levels as

25  opposed to six.

99

1           THE COURT:  Mr. Stewart.

2           MR. STEWART:  Your Honor, Mr. Theodocion is referring

3    to is what is commonly referred in the guidelines as a guided

4    departure.  That, he is correct, there is two points play under

5    the commentary to the guidelines.  It says six, but under a

6    guided departure, a Court can go down one or two or go up one

7    or two.  It's giving the Court the discretion.  The discretion

8    that when these guidelines were mandatory, that the Court now

9    enjoys completely after the *Booker* case.

10          The Government's position is that the guidelines as

11   found by the Court are correct, and that the Court, of course,

12   will fashion a fair sentence at the appropriate time, but that

13   the guidelines calculation done by the Court is correct.  And

14   under the provisions of a guided departure, the burden is upon

15   the party seeking the departure.  The Government did not seek a

16   guided departure up two points.  We would have had the burden

17   for that, and the defendant has the burden.  And based on the

18   evidence that you have from the witness stand and also in front

19   of you, the Presentence Report and such, the Government's

20   position is that the six points here, the heartland, what the

21   guidelines sets out, are appropriate in this case.

22          THE COURT:  Well, Mr. Theodocion, I hear your

23   argument.  And, of course, once the final sentence is imposed

24   in this case, you know as well as I, that I have the ability to

25   either depart from the guidelines or to vary under the 3553(a)

1   provisions.  But as it relates to this specific departure, if

2   you will, I agree that this is not one of the more egregious

3   environmental contamination cases that I've seen either in

4   private practice or on this bench.

5          On the other hand, I can't agree that this was a

6   harmless mistake that would justify me departing on this

7   particular enhancement.  I find it incredible that anyone

8   working in the wastewater treatment industry wouldn't know that

9   dropping a sump pump into a wastewater treatment pond, whatever

10  the source of the water, and pumping it directly into a creek

11  is not a serious violation of federal and environmental laws.

12  So based on that, I just do not believe that a departure on

13  this particular enhancement is appropriate.  So I hear your

14  objection or argument, and I'll overrule it.

15         MR. THEODOCION:  Yes, your Honor.

16         THE COURT:  Thank you.  The Court notes that a number

17  of objections to factual statements were -- a number of

18  objections were offered by the defense.  As to those factual

19  statements contained in the Presentence Report as to which

20  there were no objections, the Court adopts those statements.

21  As to the factual statements to which there were objections

22  that were somehow upheld, the Court will adopt the factual

23  statements as amended by the Court's findings.  A copy of which

24  the Court will order to be included in the final Presentence

25  Report.

1          Questions of guideline application have arisen which

2     the Court has gone through in detail.  Again, as to the

3     guideline applications to which there were no objections, the

4     Court adopts those.  As to the guideline applications to which

5     there were objections, the Court will adopt the application

6     guidelines as amended by the Court's previous findings in this

7     matter.  And, again, the Court orders that a copy of its

8     findings as to the modified or adjusted application guidelines

9     shall be affixed to the final Presentence Report.

10          Now, Ms. Mitchell, if my memory is correct, the only

11    adjustment that I've made is the two-level enhancement for

12    obstruction of justice.  Is that correct?

13          MS. MITCHELL:  That is correct, Judge.

14          THE COURT:  All right.  So based upon that, what

15    would be the range in this particular case with a total offense

16    level of 15.

17          MS. MITCHELL:  The guideline range is 18 to 24

18    months.  And the fine range has also been reduced to $4,000 to

19    $40,000.

20          THE COURT:  Are those the only changes, then, to the

21    Presentence Report as to the guidelines based upon my

22    adjustment?

23          MS. MITCHELL:  That's correct, Judge.

24          THE COURT:  Thank you.  Does anyone object to the

25    probation officer's calculation, then, of the appropriate

102

1   offense level and penalties now?

2            MR. THEODOCION:  No, sir.  That's correct.

3            THE COURT:  Mr. Stewart?

4            MR. STEWART:  No, your Honor.

5            THE COURT:  Now, I note that in order to arrive at

6   the Level 15, that under Paragraph 32, there is an adjustment

7   for acceptance of responsibility.  Mr. Stewart, are you

8   planning to move under 3E1.1(b) for the third and final point?

9            MR. STEWART:  Yes, your Honor, pursuant to the plea

10  agreement.

11           THE COURT:  Thank you.

12           Any objections, Mr. Theodocion?

13           MR. THEODOCION:  No, sir.

14           THE COURT:  Very well, then the Court will grant that

15  particular motion and note, then, that the three points are

16  applicable.

17           The Court hereby determines that the applicable

18  advisory guidelines for this sentencing are as follows:

19           Total Offense Level 15; Criminal History Category I;

20  18 to 24 months imprisonment; one year of supervised release;

21  $4,000 to $40,000 fine; and a $300 special assessment.

22           Does anyone know any reason at this point, then, why

23  sentencing should not proceed?

24           Mr. Stewart?

25           MR. STEWART:  No, your Honor.

1           THE COURT:  Mr. Theodocion?

2           MR. THEODOCION:  No, sir.

3           THE COURT:  All right.  Mr. Theodocion, this is the

4    part of the hearing where I will call upon you and Mr. Cason to

5    present any evidence or testimony or statements in mitigation

6    of the sentence.  So I turn the floor over to you.

7           MR. THEODOCION:  Thank you, your Honor.  And I

8    understand that several persons directly sent correspondence to

9    your office.  I apologize for that.  But Ms. Mitchell has given

10   me copies of these documents.

11          THE COURT:  No apology needed.

12          MR. THEODOCION:  Okay.  And are they in the record or

13   do you need my copy?

14          THE COURT:  They are in the record.

15          MR. THEODOCION:  I know your Honor has read them.  I

16   won't review all of those letters.  But we do just have a few

17   people that would like to speak on Daniel's behalf, your Honor.

18   We have three persons that would like to briefly be heard, if

19   that's acceptable.

20          THE COURT:  That will be fine.  That will be fine.

21          MR. THEODOCION:   Dr. Casey Stephens.

22          MR. STEPHENS:  Yes.

23          MR. THEODOCION:  If you will come up, sir.  You can

24   just tell the judge, after you say your name for the record,

25   how you know Daniel and your experience with him.

1          MR. STEPHENS:  Your Honor, it's a privilege to be

2     here.  As I think about you and this serious case, we have

3     prayed and prayed and prayed for your decision.  As far as

4     Brother Cason, he's an outstanding Christian.  I have known him

5     for, oh, approximately 25 years, he and his family.  Whatever

6     he tells you, you can trust.  If every man in this town was

7     like Daniel Cason you wouldn't need locks on your doors.  You

8     wouldn't need locks on your automobiles.  You wouldn't need

9     jails.  Because what he tells you, you can believe.  He is one

10    of our teachers.  He has served well, he and his family, at our

11    church.  And I'm honored to be able to stand in his behalf and

12    say I'm thankful to know a man like Daniel Cason.  Thank you.

13         THE COURT:  Thank you, sir.  May I ask you some

14    questions.

15         MR. STEPHENS:  Sure.

16         THE COURT:  I will admit to you that there are some

17    aspects of this case that trouble me.  But in this letter from

18    your congregation, which I appreciated, there was a statement

19    said:

20         We plead with you, Judge Hall, to remove all politics

21    from this case.

22         Tell me what you meant by that.

23         MR. STEPHENS:  We wouldn't let the Government dictate

24    to us exactly what the seriousness of this case is as far as

25    being fair with the defendant.

1              THE COURT:  How do you square the Daniel Cason that

2    you've described, and that has been described in a number of

3    letters that I've received and read, how do you square that

4    person as the person you know and see in your church as an

5    obviously very important person in your church--

6              MR. STEPHENS:  Yes.

7              THE COURT:  -- with the Daniel Cason who has pled

8    guilty to these federal crimes which involve, for lack of a

9    better word, filing false reports, lying?

10             MR. STEPHENS:  Well, I would have to say, Judge, that

11   I think he's a fall guy to be honest with you.  I've talked to

12   him.  I've prayed with him.  I've prayed with him many times

13   about it.  Therefore, I simply say, if Daniel Cason said he

14   didn't do it, he didn't do it.  I think he was coerced to sign

15   this.  Therefore, that's the reason I'm here in his behalf.

16             THE COURT:  Well, you just hit on what I'm asking.

17   You say you think he's the fall guy.  Why is that?

18             MR. STEPHENS:  Because of all the evidence that is

19   there.  You see, as I was listening to the State, there's no

20   proven evidence that the water was contaminated.  None

21   whatsoever.

22             THE COURT:  Do you think he's the fall guy because of

23   the federal charges or do you think he's the fall guy for the

24   City of Harlem?

25             MR. STEPHENS:  Could be the City of Harlem.

1          THE COURT:  Okay.

2          MR. STEPHENS:  But I still, as I've told him all the

3     time, Brother Daniel, I'll stand with you.  I believe you.

4          THE COURT:  Okay.

5          MR. STEPHENS:  Thank you, Judge.

6          THE COURT:  Thank you for your candor and honesty and

7     for coming.

8          PERSON IN THE GALLERY:  Your Honor, permission to

9     speak.

10          THE COURT:  Has this gentlemen been called by anyone?

11          PERSON IN THE GALLERY:  No, sir.  I'm a concerned

12     citizen.  I've been knowing Daniel Cason for a long time.

13          THE COURT:  Unless you're called by either the

14     defense or the Government, sir, I'm not going to recognize you

15     today.

16          PERSON IN THE GALLERY:  All right, sir.

17          THE COURT:  Mr. Theodocion, go right ahead.

18          MR. THEODOCION:  Thank you, your Honor.  Jerry

19     Campbell.

20          Mr. Campbell, when you get the microphone, the judge

21     has heard the evidence and made legal determinations on the

22     case.  If you could just give the judge some of your

23     impressions of Daniel away from this case as a person and your

24     experiences with him.

25          MR. CAMPBELL:  Well, thank you, Judge, for the

1   opportunity to come before your court today and say something

2   about Mr. Cason who I feel is a dear friend, a real Christian

3   man.  I've known Mr. Cason for approximately ten years.  I know

4   that he is a real Christian, true Christian man, somebody that

5   would do what's right.  I don't think that he would

6   intentionally do anything that's against the law or against any

7   rules.  I had the opportunity to work for Mr. Cason for about

8   two years at this treatment plant.  My tenure there under him,

9   he always encouraged us to do what was right.  Do not, if the

10  numbers didn't come out right, they just didn't come out right.

11  That's what you reported.

12          THE COURT:  Mr. Campbell, when you were employed

13  there with Mr. Cason, did you ever see any evidence or sense

14  that he was being directed to do any of this activity by

15  someone else within the government of the City of Harlem?

16          MR. CAMPBELL:  Anything that he did came from the

17  direction of his supervisor or from the counsel.  I never saw

18  anything that was done illegally.  I was not present during the

19  timeframe that is in question here today.

20          THE COURT:  Okay.

21          MR. THEODOCION:  Thank you, Mr. Campbell.

22          THE COURT:  Thank you, Mr. Campbell.

23          MR. THEODOCION:  And lastly, your Honor, Mr. Henry

24  Chambers, another long-time friend.

25          MR. CHAMBERS:  Thank you, your Honor, for having the

1    patience to listen to me this morning.

2             THE COURT:  Thank you for coming.

3             MR. CHAMBERS:  If I could, I will read my comments.

4             THE COURT:  That will be fine.

5             MR. CHAMBERS:  I just wanted to make sure that I

6    covered the material that I wanted you to hear.

7             Your Honor, my name is Henry Chambers, Jr.  I'm a

8    deacon at Trinity Baptist Church.  I stand before you this

9    morning on behalf of Mr. Daniel Cason, Brother Daniel Cason, my

10   brother in Christ, and my Sunday School teacher.

11            I have known Mr. Cason and his family for over 20

12   years.  I have never known a more godly man in my life.  Nor

13   any other man -- I've never known a more godly man.  Mr. Cason

14   is honorable, an honorable man, superb with superb integrity, a

15   mortal man, I nor any man is perfect.  But Mr. Cason has the

16   qualities that any business would look for as a potential

17   employee.  He has a kind of willing spirit, always willing to

18   help anyone.  And it is my belief that the City of Harlem was

19   looking for a fall guy to charge the infraction of the law on,

20   and they chose Mr. Cason.  And certainly Mr. Cason did not

21   willingly or knowingly break the law.

22            Mr. Cason is a veteran of Vietnam as I am.  He as

23   well as myself were subjected to returning from the war and

24   witnessing President Jimmy Carter pardon those men who chose

25   not to serve this country in Vietnam and ran to Canada.  I know

1    this is far reaching.  Those men who chose not to serve their

2    country in Vietnam, and ran to Canada, this is an act of

3    desertion in the time of war.  Certainly, Mr. Cason deserves to

4    be pardoned of any wrongdoing that he may have been charged

5    with.

6          Your Honor, I know you have rules that you must

7    follow.  I request that you dismiss the charges presently

8    against Mr. Cason and find him the correct person to charge --

9    or find the correct person to charge.

10          Respectfully, Henry, E. Chambers, Jr, servant of the

11   Lord.

12          Perhaps I should have just told you without reading

13   it.  But anyway, Daniel is my Sunday School teacher.  If I

14   wanted to be judged by any person, any mortal person, in this

15   country, I would want to be judged by Daniel Cason.  He's a

16   fine man.  I don't think you'll find a finer man walking in

17   shoes.  That's the end of my statement, sir.

18          THE COURT:  Thank you.

19          MR. THEODOCION:  Thank you, sir.

20          Judge, I'll just -- I know you've read the

21   Presentence Report.  Just to highlight a few things about

22   Daniel.  He's 66 years of age.  He only completed the ninth

23   grade.  He ended up getting his GED later.  So he did not come

24   into wastewater with degrees and, you know, two or three

25   scientific sheepskins on the wall.  And he had a tough task out

1    there.

2            He's been married 47 years to his wife, Louise, who

3    is here today.  He has three sons, Daniel, Tracy, and Dusty,

4    who are all here.  Obviously, numerous other friends, too many

5    friends to mention are here.  Probably the majority of them are

6    from his church.  He's very active not only in the lives of his

7    family, his sons, but also his church, as you heard.  He did

8    enlist in the United States Army in 1966.  He was honorably

9    discharged with a rank of E5 Sergeant.  Some of the awards that

10   he received, the Army Commendation Medal, Vietnam Service Medal

11   with Bronze Service Star, National Defense Service Medal,

12   Vietnam Campaign Medal as Sharp Shooter, Combat Infantryman's

13   badge, and two Outstanding Service Bars.

14           From '72 to '90 he was employed at Fort Gordon as a

15   civil service employee.  He began working at the City of Harlem

16   in 1994, was there through 2009 where he earned a modest income

17   and worked hard.  And tried to serve the City of Harlem.

18           We didn't prompt the people who came up there to

19   speak to your Honor.  Daniel has pled guilty to three federal

20   offenses dealing with reports.  He's always maintained, just

21   like Mr. Baldwin maintained, that they didn't feel like they

22   were contaminating anybody or putting anybody at risk.  And

23   if -- and I truly believe that Daniel would have rather drank

24   that water out of the hose into his mouth than put a person or

25   land at risk of contamination.  But that's just not how you do

1    it.  And we understand.

2         The guidelines are very strict, however, though,

3    Judge.  And we're looking at a total level of 15 and 10 levels

4    out of that 15 comes from conduct which has not been pled to,

5    and which has been subject to the lower standard of proof.  And

6    it kind of goes back to the problems that a lot of us have

7    always had with the sentencing guidelines.  And we feel like we

8    can come into court and defend ourselves with the liberties and

9    rights that we have, and the Government, before we're going to

10   be sentenced for something, we have to be proved beyond a

11   reasonable doubt.  We have a right to have a jury hear it.

12   And, unfortunately, in this case, we had some minor charges

13   that he was definitely guilty to.  And so a plea would have to

14   be forthcoming.

15        And so, unfortunately, though, your Honor, that

16   subjects you to this more serious punishment in areas which you

17   really don't -- I mean, you still have due process rights, but

18   they're certainly not the rights associated with the primary

19   Bill of Rights that we look at in these kinds of cases.

20        But, as Mr. Stewart has conceded, you do have

21   discretion.  And it's particularly appropriate in a case like

22   this where you have the incident with the pumping that is such

23   a large part of these levels.  And it could deal with such a

24   variety of different types of occurrences.  And one thing about

25   the 3553 factors is they tend to primarily focus on the

112

1   defendant whereas the guidelines is all conduct-oriented.  It's

2   all conduct.  In 3553, it allows you to do things that you used

3   to not be able -- you couldn't ask for a downward departure

4   because a man was honorably discharged from Vietnam, that he

5   enlisted and he went to war, and he was on the battlefield.

6   You couldn't do it; it was inappropriate.  But it is

7   significant.

8          When a man 66 years of age, he has no juvenile or

9   adult criminal history.  You know, he's worked either for his

10  national government or city government roughly his entire life

11  with courage and with honor, then he should come into court and

12  that should mean something.  I know it does mean something.

13  So, Judge, we're going to ask your Honor that based on the fact

14  that the level, the guideline level, even with all that being

15  said is only 18 to 24 months.  And knowing that your Honor is

16  charged to give a sentence that does enough to satisfy the

17  concerns and the goals of 18 3553, but not too much, we just

18  humbly ask your Honor to consider a sentence that does not

19  involve placing Mr. Cason in a federal penitentiary.

20          I think based on the loss of his career, the loss of

21  his good name and the significant, I'm not sure inconvenience

22  is the right word, but life-altering situation that even

23  pretrial release puts you in, but certainly supervised release,

24  probation, does, that your Honor could fashion a sentence that

25  could satisfy those goals.  And it's hard for me to consider --

1    I know that the goals as they relate to the defendant that

2    confinement time would be more than necessary.  He came into

3    court and he admitted what he did.  And he's always done that.

4    And we had evidentiary disputes and things of that nature and

5    judicial disputes.  Those are more for me than anybody else.

6    But he knows what went on, and it's cost him tremendously.

7    It's cost him.  And he's paid a great price and will continue

8    to as a convicted felon, which he has been for several months

9    now.

10            So, basically, Judge, that's it.  We'll just ask you

11   to consider a sentence that will not involve incarceration.

12            THE COURT:  Mr. Cason, I'm required to ask you if you

13   have anything you'd like to say to the Court.  Do you?

14            THE DEFENDANT:  Your Honor, I'd just like to say that

15   everything that you see is not as it seems all the time.  And I

16   done what I done here because I felt like I would get time if I

17   went the other way.  I feel like that if I had of went through

18   the court process and fought this thing the whole way through,

19   it would have been a long drawn out thing.  It would take a

20   while to fight it.  But there are certain things that were said

21   here that is not true.  None of it.  And I could prove them

22   given time.  But I felt like this was my shortest bat and

23   easiest way to get through this system.  And I'm not the

24   criminal that it makes me look like I am today.

25            THE COURT:  Mr. Stewart, your opportunity to respond.

1          MR. STEWART:  Thank you, your Honor.  We began this

2   sentencing hearing earlier this morning with the count -- with

3   the court recounting for the record that on March 31st, 2009,

4   the defendant appeared before yourself, the Honorable J. Randal

5   Hall, a United States District Court Judge, and pled guilty to

6   three counts of the indictment, which essentially charge lying

7   on forms that he was required to submit; forms he, as the

8   Director of Public Works for the City of Harlem, was required

9   to submit.  In that position of trust, public trust, the

10  defendant broke the law, and came in and admitted it, to his

11  credit.

12          And as part of his plea agreement where he came in

13  and admitted it, he also admitted that he knowingly caused

14  pumping to occur.  That's in the black and white language of

15  his plea agreement that he signed.  So he admitted to breaking

16  the Clean Water Act, to lying.  And he did so standing in front

17  of your Honor, testifying that he was here without coercion, of

18  his own free will and accord.  And then he has come before us

19  today, your Honor, through very able counsel, and presented his

20  position.

21          The Government doesn't get to choose its defendants.

22  We take crime where it's found and where the evidence takes us.

23  And we've presented that evidence in this case, and the

24  defendant elected of his own free will and accord to plead

25  guilty to violating the Clean Water Act.  And so now the day of

1   reckoning has come.  And the Court, under the law, under the

2   duty imposed upon you, will impose a sentence consistent with

3   the factors that Congress has set out.

4          Mr. Theodocion referred to Section 3553.  That's the

5   section that lays out the different elements that the Court

6   considers in imposing sentence; elements that you're bound to

7   follow at Congress's demand.  You've also followed the

8   sentencing guidelines which have been put into place through

9   the same procedure.  Yet, one of those factors in Section 3553,

10  the section which has been referred to as the one that allows

11  the molding of the sentence to the defendant, is the element of

12  deterrence.

13         This Court will speak loudly today when it imposes

14  its sentence in this matter.  And one of the elements that the

15  Court, through its sentence, will pronounce, one of those

16  elements is deterrence.  And people, similarly situated to

17  Mr. Cason, directors of public works all around will look to

18  see what happened today, to see what happens when you lie on

19  reports that the public is trusting you to turn in, when you

20  knowingly cause pumping, as the defendant admitted in his plea

21  agreement.  They're going to see what happens, the consequences

22  of that.

23         The consequences for Mr. Cason so far have been that

24  he was charged as laid out in the plea agreement, in

25  August 14th, 2008, pled guilty March 31st, 2009.  And as the

1    plea agreement reflects, he maintained his job.  He was on

2    administrative leave for a good while after being charged, but

3    he maintained his job until the end of May of 2009.  He's no

4    longer in the job.  But for two months after pleading guilty to

5    a federal felony offense, applicable to his distinct position,

6    he maintained his job.  So, now, the time for judgment has come

7    because it hasn't occurred before then.  The time for the

8    consequences and the message of deterrence to come out, as

9    required by the law.

10          As the Government has stated previously, the

11   Government steadfastly maintains that you've been vested with

12   the authority, the discretion to make the fair sentence under

13   the law.  And Congress has set out the factors.  You have the

14   guidelines, which are used to maintain equality across this

15   country in the sentencing of individuals.  And then you have

16   the factors set out by the Congress itself.  Deterrence, the

17   message that is sent for what has occurred and what has been

18   presented today.

19          Your Honor, the Government requests that the Court

20   follow the guidelines, the guidelines which have been in place

21   for a long time to govern these situations because they will

22   lead you to the fair and just result.  This is a case about a

23   public works director, the head of the plant.  This isn't some

24   random fellow out in the public.  Someone whose job it was to

25   tell the truth on these forms, to run that plant according to

1    the law.  And it didn't happened.  And so a message needs to be

2    sent because people will be listening.  Thank you, your Honor.

3              THE COURT:  Anything else from anyone?

4              I'm going to take about a ten-minute recess.  I'll be

5    back at, let's say, 20 till.  That will be a little longer than

6    ten minutes.  Twenty till.

7                        (AFTER RECESS)

8              THE COURT:  Mr. Theodocion, if you and Mr. Cason

9    would come to the lectern please.

10             Mr. Cason, this is what I call an iceberg case.  For

11   some reason today, and as I've prepared for this hearing, I

12   have a strange sense that I'm just seeing the tip of the

13   iceberg.  I'm troubled by that.  You've pled guilty to filing

14   false statements, been convicted of that crime.  But I'm just

15   not convinced that I have the whole story about what went on at

16   that wastewater treatment plant.  I wish that I did.  Maybe one

17   day I will.

18             But as a result, I only have your conviction to deal

19   with.  Now, let me say that the Clean Water Act reflects the

20   American public's concern over clean waterways and the need to

21   control water pollution.  The Court notes that the objective of

22   that Act is to restore and protect the integrity of our

23   nation's waters.  Now, an unlawful discharge and the filing of

24   reports that may or may not have disclosed unlawful discharges

25   into our nation's waters are disturbing anywhere, but

1   particularly so in Augusta, where the Savannah River is the

2   reason that we are here.  The Savannah River is the source of

3   our commerce and has been for most of our history.  And now the

4   Savannah River is a critical source of the drinking water for

5   many communities, including Columbia County and Augusta.

6            I firmly believe that the maintenance of a clean

7   river, of a clean Savannah River, is critical to the future and

8   viability of our area.  I also note, Mr. Cason, that when

9   citizens hear that government officials who occupy a position

10  of public trust take steps to avoid compliance with the law,

11  including the filing of false reports, it only further erodes

12  public confidence in our government.  Pollutions, streams and

13  creeks can have a devastating impact on humans, on wildlife and

14  on commerce.

15           Now, whether you were the fall guy in this case, I

16  don't have the evidence to say that one way or another.  It's

17  been implied here today.  And, certainly, I have suspicions.

18  But the bottom line is, you were the director of a wastewater

19  treatment plant in Harlem, Georgia charged with the

20  responsibility of insuring that that wastewater treatment

21  complied with every aspect of our nation and state's

22  environmental laws.  And in that, you violated that trust by

23  filing false reports, again, which covered up unlawful activity

24  related to the discharge of pollutants into a tributary that

25  led directly into the Savannah River.

1         I have listened to the defendant and his counsel.  I

2    have listened to a number of citizens who have come and

3    testified on behalf of the defendant.  I have reviewed the

4    Presentence Report.  I have considered the factors set forth in

5    18 United States Code Section 3553.  As it relates to those

6    factors, I have paid particular attention to the history and

7    characteristics of this defendant.

8         Mr. Cason has no criminal record.  He apparently has

9    been a leader in his church for a number of years, teaching

10   Sunday School.  With the exception of these incidents that

11   relate to the crimes for which he has pled guilty and been

12   convicted, it appears that he's led a law-abiding life as a

13   citizen of this country and this district.  I take note of his

14   very impressive military record and certainly thank him for

15   that record.

16        I've also paid close attention to factor (a)(2)(A)

17   which is the need for the sentence imposed to reflect the

18   seriousness of the offense, to promote respect for the law, and

19   to provide just punishment for the offense.  Related to that is

20   factor (2)(B), to afford adequate deterrence to criminal

21   conduct.

22        In this particular case, I have the director of a

23   wastewater treatment facility that has engaged in activities

24   that have resulted in the violations of our laws.  Harlem is

25   not the only town in this area with knowledge of this case.

120

1    There are a lot of other towns, large and small.  A lot of

2    other wastewater treatment directors that are probably watching

3    this case who may, because of budget constraints, be enticed or

4    tempted to take steps in order to save money but rather would

5    lead to environmental violations.  Certainly this sentence

6    needs to act as a deterrent to anyone or any municipality or

7    county that may be contemplating making cost-benefit decisions

8    that should not be made.

9            Relying on those factors that I've just discussed,

10   those specific factors under 3553(a), I have decided that I

11   will vary downward in the final sentence that is imposed in

12   this case.  Therefore, pursuant to the Sentencing Reform Act of

13   1984, it is the judgment of the Court that the defendant,

14   Daniel Webster Cason, is hereby committed to the custody of the

15   Bureau of Prisons to be imprisoned for a term of 12 months and

16   one day as to each of Counts Three, Five and Eleven to be

17   served concurrently.

18           The Court notes again that this is a variance based

19   upon the Court's consideration of the factors set forth in 18

20   U.S.C. Section 3553(a).  The Court finds no reason to depart

21   from the sentence called for by application of the advisory

22   guidelines inasmuch as the facts in this case are of the kind

23   contemplated by the Sentencing Commission.  Nevertheless, a

24   variance under 3553 is warranted.

25           Upon considering the factors set forth in United

1   States Sentencing Guideline Section 5E1.2D, it is ordered that

2   the defendant shall immediately pay to the United States a fine

3   of $3,000.  Payment is to be made payable to the Clerk of the

4   United States District Court.  It is further ordered that the

5   defendant shall pay to the United States a special assessment

6   of $100 as to each count, for a total of $300, which shall be

7   due immediately.

8           Upon release from imprisonment, the defendant shall

9   be placed on supervised release for a term of one year.  While

10  on supervised release, the defendant shall comply with the

11  standard conditions of supervision adopted by this Court and

12  the mandatory conditions required by 18 United States Code

13  Section 3583, which will include, but not be limited to, urine

14  testing, a prohibition against possession of any firearm or

15  other dangerous weapon and a prohibition against violation of

16  any law.

17          Further, the defendant shall cooperate in the

18  collection of a DNA sample as directed by the probation officer

19  pursuant to 18 United States Code Section 3583.  The defendant

20  shall participate in a program of testing for drug and alcohol

21  abuse.  And if the Court determines that it is necessary, the

22  defendant shall participate in a program of treatment for drug

23  and alcohol abuse.

24          The defendant shall complete 100 hours of community

25  service during the first 10 months of supervision.  The

122

1   defendant shall provide the probation officer with access to

2   any requested financial information.  The defendant shall not

3   incur new credit charges or open additional lines of credit

4   without the approval of the probation officer unless the

5   defendant is in compliance with the installment payment

6   schedule.

7          A curfew is imposed as a special condition of

8   supervised release.  The defendant shall not leave his

9   residence from 10:00 p.m. until 6:00 a.m. daily during the

10  period of supervision except when such leave is approved in

11  advance by the probation officer.

12         The probation officer is hereby directed to provide

13  the defendant with a written statement which sets forth all of

14  the conditions to which the term of supervised release is

15  subject.

16         The Court has accepted the plea agreement because it

17  is satisfied that the agreement adequately reflects the

18  seriousness of the actual offense behavior and that accepting

19  the plea agreement will not undermine the statutory purposes of

20  sentencing.  In accordance with the plea agreement, it is

21  ordered that Counts One, Two, Four and Six through Ten of the

22  indictment be dismissed.

23         Ms. Mitchell, do you have any recommendation on

24  reporting?

25         MS. MITCHELL:  Your Honor, we normally wait 30 days

123

1    following sentencing.  I do not have a calendar, Judge.

2              THE COURT:  That's all right.  I have one.  Just a

3    moment.

4              MS. MITCHELL:  By 2:00 p.m.

5              THE COURT:  Let's say Tuesday, January 19th.  Monday

6    is a holiday.

7              MS. MITCHELL:  Okay, Judge.

8              THE COURT:  All right.  Tuesday, January 19th,

9    2:00 p.m.  Tuesday, January 19th.  The Bureau of Prisons will

10   notify you of that location.  That is January 19th, 2010.

11             Pursuant to the plea agreement with limited

12   exceptions, the defendant has waived all rights conferred by 18

13   United States Code Section 3742 to appeal this sentence.  The

14   defendant has also waived the right to appeal this sentence on

15   any other ground and has waived the right to attack this

16   sentence in any post-conviction proceeding.

17             Sentence has now been pronounced.  Other than any

18   objections which have previously been stated for the record,

19   does anyone have any objection as to the Court's finding of

20   fact, conclusions of law or to the manner in which the sentence

21   was pronounced?

22             Mr. Stewart?

23             MR. STEWART:  No, your Honor.

24             THE COURT:  Mr. Theodocion?

25             MR. THEODOCION:  Judge, would you be willing to

124

1    include in your sentence a recommendation of confinement in the

2    area?  Either Edgefield or Estill?

3           THE COURT:  I will.  I will recommend to the Bureau

4    of Prisons that the defendant be housed either in the Estill,

5    South Carolina Federal Correctional Institution or the

6    Edgefield Federal Correctional Institution.

7           Anything else?

8           MR. THEODOCION:  No, sir.

9           THE COURT:  Thank you.

10

11

12

13

14

15

16

17                      CERTIFICATION

18           I certify that the foregoing is a true and correct

19   transcript of the stenographic record of the above-mentioned

20   matter.

21

22   /s/ Rhea Rangel_____          January 25, 2009_____

23   Rhea Rangel, RPR                      Date

24

25